Robert L. Weigel
Robert F. Serio
Andrew R. Keats
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff Discover Growth Fund*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

DISCOVER GROWTH FUND,

               Plaintiff,

      -against-

6D GLOBAL TECHNOLOGIES INC.; NEW
YORK GLOBAL GROUP, INC.; NYGG
(ASIA), LTD.; BENJAMIN TIANBING WEI
A/K/A BENJAMIN WEY; TEJUNE KANG;
MARK SYNKOWSKI; ADAM HARTUNG;
DAVID S. KAUFMAN; TERRY MCEWEN;
ANUBHAV SAXENA; TIANYI WEI;
MICHAELA WEI; SEREF DOGAN ERBEK,

               Defendants.

--------------------------------------------------------x

**COMPLAINT**

**15 Civ. _____**

Plaintiff Discover Growth Fund ("Plaintiff" or "Discover"), by and through its

undersigned attorneys, Gibson, Dunn & Crutcher LLP, for its complaint against defendants 6D

Global Technologies, Inc. ("6D Global" or the "Company"), New York Global Group, Inc.

("NYGG"), NYGG (Asia), Ltd.,  Benjamin Tianbing Wei, Tejune Kang, Mark Szynkowski,

Adam Hartung, David S. Kaufman, Terry McEwen, Anubhav Saxena, Tianyi Wei, Michaela

Wei, and Seref Dogan Erbek (collectively, "Defendants"), respectfully alleges as follows:

## SUMMARY OF ACTION

1.      On August 10, 2015, Discover entered into a Stock Purchase Agreement (the

"SPA"), attached hereto as Exhibit A, with 6D Global, a publicly traded company listed on the

NASDAQ under the ticker symbol "SIXD", pursuant to which Discover paid $10,000,000 in

exchange for 1,088 convertible preferred shares of 6D Global.

2.      At the time of Discover's purchase of shares from 6D Global, on paper, including

in filings with the Securities and Exchange Commission (the "SEC") and in investor

presentations and marketing materials provided to Discover, 6D Global was a fast-growing,

award-winning, digital business, marketing and technology company providing a portfolio of

digital business solutions to Fortune 500 clients and other industry leaders across the country and

globe.  Unbeknownst to the SEC, Discover and the rest of the investing public, 6D Global, along

with its executives, officers and directors, was nothing more than a front for a multi-million

dollar, cross-border ponzi scheme masterminded by Defendants Benjamin Wei and NYGG.

3.      On September 8, 2015, the Department of Justice ("DOJ") indicted Wei in this

Court, *United States v. Benjamin Wey, et al.*, 15-crim-611 (the "Indictment"), on charges of

securities fraud, stock manipulation, money laundering, and wire fraud, and on September 10,

2015, the DOJ arrested Wei and the SEC filed a civil action in this Court, *United States*

*Securities and Exchange Commission v. Benjamin Wey*, et al., 15-cv-07116 (PKC) (the "SEC

Action"), against Wei, NYGG and certain other Defendants for their roles in the fraudulent

scheme to obtain and profit from undisclosed, controlling ownership interests in several U.S.

companies spawned via "reverse Chinese mergers," including 6D Global, that were actually and

secretly controlled and dominated by Wei and NYGG.

2

4.     The DOJ and SEC's investigation into the Weis' fraudulent activities was underway long before the SPA was executed.  Wei and others were subpoenaed by the government and asserted their Fifth Amendment rights against self-incrimination.  Defendants willfully concealed and never disclosed information about the investigation or the role of Wei and other defendants in controlling 6D Global, manipulating its stock price and siphoning of profits of NYGG-controlled companies such as 6D Global (through the receipt of millions of dollars in fees paid to Wei nominees for services purportedly related to private placements and secondary offerings), and despite their clear knowledge of all of these facts.  Both the Indictment and the SEC Action, attached hereto as Exhibits B and C respectively, detail the specifics of the fraud scheme as it pertains to 6D Global among other companies, and those allegations are incorporated herein by reference.

5.     Each and every one of the Defendants was complicit in the scheme to defraud Discover and the investing public and to secure $10 million from Discover on fraudulent pretenses in violation of U.S. securities laws and common law.

6.     By this action, therefore, Discover seeks, *inter alia*, to have the SPA rescinded and its $10M investment returned, with interest.

## THE PARTIES

7.     Plaintiff Discover is a Cayman Islands exempted mutual fund with its registered office in the Cayman Islands.

8.     Defendant 6D Global is a Delaware corporation headquartered in New York, New York.  6D Global has traded on the NASDAQ under the ticker symbol, "SIXD."

9.     Defendant NYGG is a Delaware corporation headquartered in New York, New York, with a second office located in Beijing, China.  According to 6D Global's most recent

filings with the SEC, as of March 19, 2015, NYGG is a holder of 45% of the outstanding shares of common stock of 6D Global.

10.     Defendant NYGG (Asia), Ltd. is a subsidiary of NYGG located in Beijing, China.

11.     Defendant Benjamin Wei (also known as Benjamin Wey and Tianbing Wei) is the founder and principal of NYGG.  On September 8, 2015, Wei was indicted by the United States Attorney for the Southern District of New York for stock manipulation and the amassing of undisclosed beneficial ownership of more than five percent of the stock of 6D Global, among other companies, and on September 10, 2015 was placed under arrest.  Wei resides in New York, New York.

12.     Defendant Tejune Kang is the Chairman and Chief Executive Officer of 6D Global.  According to the most recent filings with the SEC, as of March 19, 2015, Kang is a holder of 29.7% of the outstanding shares of common stock of 6D Global.  Kang resides in or around New York, New York.

13.     Defendant Mark Szynkowski is the Chief Financial Officer of 6D Global.  Szynkowski resides in or around New York, New York.

14.     Defendant Adam Hartung is a director of 6D Global.  Hartung resides in or around Chicago, Illinois.

15.     Defendant David S. Kaufman is a director of 6D Global.

16.     Defendant Terry McEwen is a director of 6D Global.  McEwen resides in or around Princeton, New Jersey.

17.     Defendant Anubhav Saxena is a director of 6D Global.  Saxena resides in or around San Francisco, California.

18.     Defendant Tianyi Wei (also known as Sarah Wei) is Wei's sister and an employee and manager of NYGG's office in Beijing, China.  Tianyi Wei resides in China.

19.     Defendant Michaela Wei is Wei's wife and an attorney licensed to practice in New York.  Michaela Wei held trading authority over Swiss Brokerage accounts in the names of her family members and others who held warrants or other positions in the shares of 6D Global. Michaela Wei resides in New York, New York.

20.     Defendant Serf Dogan Erbek was an employee of a firm based in Geneva, Switzerland that provided "financial and fiduciary services" for third parties controlled by the Weis, and assisted the Weis in concealing their control and structuring their holdings in 6D Global to evade securities reporting requirements.

## JURISDICTION AND VENUE

21.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, for claims arising under Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78aa].  This Court has supplemental jurisdiction over the common law claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### The SPA and 6D Global's Representations and Warranties

23.     On August 10, 2015, Discover entered into a SPA with 6D Global, a publicly traded company trading on the NASDAQ under the ticker symbol, "SIXD," pursuant to which Discover agreed to pay $10,000,000 in exchange for 1,088 shares of Series A Redeemable Convertible Preferred Stock of 6D Global (the "Preferred Shares"), convertible into Common

5

Stock at $5.25 per share.  Upon execution of the SPA, Discover delivered to 6D Global the sum of $10,000,000 by wire transfer and received the Preferred Shares on August 13, 2015.

24.   To induce Discover to enter into the SPA, 6D Global made representations in the SPA that it knew to be false when they were made, and omitted critical information it knew to be material, and willfully concealed the truth by rushing to close the transaction before Wei's arrest. Among other things, 6D Global made the material false representations and the material omissions discussed below.

25.   As a condition under the SPA to securing Discover's purchase of the Preferred Shares, 6D Global asserted not only that it was "in compliance with all requirements to maintain listing on the Trading Market" (Exhibit A § II.C.2) and that all of "[t]he representations and warranties of [6D Global] . . . set forth in this Agreement are true and correct in all material respects" (Exhibit A § II.C.3), but more specifically, and among other representations and warranties, that:

(a) **Litigation**.  There is no Action pending or, to the knowledge of the Company, threatened, which would reasonably be expected to result in a Material Adverse Effect.  Neither Company nor any Subsidiary, nor to the knowledge of Company any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of Company, there is not pending or contemplated, any investigation by the Commission involving Company or any current or former director or officer of Company. (Exhibit A § III.B.5)

(b) **Public Reports; Financial Statements**. Company has filed all required Public Reports for the one year preceding the Effective Date. As of their respective dates or as subsequently amended, the Public Reports complied in all material respects with the requirements of the Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, as applicable, and none of the Public Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Company included in the Public Reports, as amended, comply in all material respects with applicable

6

accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments. (Exhibit A § III.B.3)

(c) **Material Changes.** Since the end of the most recent year for which an Annual Report on Form 10-K has been filed with the Commission, (a) there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect[1] . . . (Exhibit A § III.B.4)

(d) **<u>Compliance.</u>** Neither Company nor any Subsidiary (a) is in material default under or in material violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by Company or any Subsidiary under), nor has Company or any Subsidiary received notice of a claim that it is in material default under or that it is in material violation of, any indenture, loan or credit agreement or any other similar agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any order of any court, arbitrator or governmental body, or (c) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business, except in each case as would not reasonably be expected to have a Material Adverse Effect. (Exhibit A § III.B.8)

(e) **<u>Sarbanes-Oxley; Internal Accounting Controls</u>**. Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002, which are applicable to it as of the date of the Closing. Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the ineffectiveness of Company's disclosure controls and procedures based on their evaluations as of the evaluation date. Since the date of the most recently filed periodic report under the Exchange Act, there have been no significant changes in Company's internal accounting controls or its disclosure controls and procedures or, to Company's knowledge, in other factors that could materially affect Company's internal accounting controls or its disclosure controls and procedures. (Exhibit A § III.B.14)

---

[1] The SPA defines "Material Adverse Effect" to include "any material adverse effect on (a) the legality, validity or enforceability of any Transaction Document, or (b) the results of operations, assets, business, or financial condition of [6D Global] and the Subsidiaries, taken as a whole, which is not disclosed in the Public Reports prior to the Effective Date, or (c) [6D Global's] ability to perform in any material respect on a timely basis its obligations under any Transaction Document." (Exhibit A, Ex. 1.)

(f) **Listing and Maintenance Requirements**.  The Common Stock is registered pursuant to Section 12 of the Exchange Act, and Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has Company received any notification that the Commission is contemplating terminating such registration.  Company has not, in the 12 months preceding the Effective Date, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that Company is not in compliance with the listing or maintenance requirements of such Trading Market. Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.  (Exhibit A § III.B.17)

(g) **Foreign Corrupt Practices**.  Neither Company, nor to the knowledge of Company, any agent or other person acting on behalf of Company, has (a) directly or indirectly, used any corrupt funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by Company, or made by any person acting on its behalf of which Company is aware, which is in violation of law, or (d) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.  (Exhibit A § III.B.20)

26.     Each of the above written representations and warranties in the SPA were, and were intended to be, false at the time they were made because, on information and belief,  (a) all Defendants were aware that the NASDAQ listing had been procured and maintained via Wei's stock manipulations, thus the representation about compliance with all "requirements to maintain the listing on the Trading Market" was false;   (b) contrary to the Litigation representation, all Defendants were aware of an "investigation pending . . . affecting Company", to wit the DOJ and SEC investigations in which controlling person Wei had taken the Fifth and that would result in the Indictment and SEC action and the suspension of trading in the Company's stock; (c) the Company's most recent 10-K and proxy were materially misleading because (i) they do not identify Wei or disclose his total domination and control of the Company, its board and its officers via his 6D Global majority holdings both personally and through NYGG, NYGG-Asia

and other nominees and (ii) the 6D Global financial statements contained in the Company's SEC

filings do not disclose the foregoing or Wei's siphoning off of funds via fees paid to his

nominees or the Company's numerous other compliance and internal control violations; (d) the

Material Changes representation was violated because there was an "event, occurrence or

development that . . . would reasonably be expected to result in, a Material Adverse Effect"

defined to include "any material adverse effect on . . . (b) the results of operations, assets,

business or financial condition of the Company and the subsidiaries, taken as a whole, which is

not disclosed in the Public Reports prior to the Effective Date . . . ."  Again, Defendants violated

the Material Change representation because their knowledge of the investigation into Wei, his

stock manipulations, asset siphoning, and the imminent Indictment, SEC Action and NASDAQ

delisting was material information that was not disclosed to Discover prior to and in connection

with the execution of the SPA.

27.     Also, in connection with and to willfully conceal the true facts so that Discover

would close on its purchase of the Preferred Shares, 6D Global, and specifically its Chairman

and CEO Tejune Kang, represented to Discover that the $10,000,000 purchase price was needed

for 6D Global to fund two separate acquisitions, each valued at $10 million, each acquisition to

be funded half in cash and half in stock.  The negotiations were fast paced, pushed by Kang and

6D Global's eagerness to close and secure the $10 million in financing, purportedly to enable it

to pursue the pending acquisitions immediately upon receipt of funds.

28.     In reality, however, on information and belief, 6D Global needed to close the SPA

quickly because the DOJ's and SEC's investigation of Wei and NYGG was wrapping up and the

filing of the Indictment and SEC Action was imminent.  6D Global knew that once the

Indictment and SEC Action were filed, it would be impossible for 6D Global to secure financing

needed to stay in business.  Given the absolute and total control Wei exerted over Kang and 6D

Global, it is clear that Wei, with the knowledge and assistance of Kang and 6D Global (among

others), was looking to cash in one last time before his Ponzi scheme was revealed.

29.     As Discover was to soon learn, these representations and others were false when

made.  6D Global had knowingly and intentionally made and would continue to knowingly and

intentionally make material misrepresentations and omissions rendering the SPA invalid.

**Discover Is Introduced to Defendant Benjamin Wei, Revealing Misrepresentations
and Ommissions in 6D Global's Proxy Statement and SEC Filings**

30.     Shortly after executing the SPA, Discover received an email on August 15, 2015,

from 6D Global's Chairman Tejune Kang, requesting a meeting in the offices of Discover's

investment advisor.  Kang informed Discover that he was bringing a representative of NYGG

Asia, 6D Global's largest shareholder.

31.     6D Global's proxy statement, filed in connection with issuance of the Preferred

Shares, and incorporated into the 6D Global's most recent Form 10-K, as filed with the SEC on

March 19, 2015, identifies NYGG Asia as holder of approximately 45% of the 6D Global's

outstanding shares.

32.     At the meeting on August 18, 2015, Tejune Kang introduced Benjamin Wei as his

controlling stockholder, saying "basically, I work for him."  Wei, whom Discover had never

heard of and never seen before, proceeded to inform Discover, for the first time, that he

controlled NYGG, and that through NYGG he controlled all of 6D Global, its stock, and its

operations, and that Kang worked for him.  Wei further stated that there was "no real public

float" and that virtually all free trading shares of the company were controlled by him and his

"friends in China."  He further explained that the rebound in stock price that had occurred for no

apparent reason shortly after Discover entered into the SPA was caused by Wei and his group,

further proving his control over the stock of 6D Global.  Wei told Discover, in the presence of

Kang, that if Discover ever wanted to sell its shares, it should not sell them in the open market

but should instead sell them directly to Wei or to whom he directed.

33.     This meeting proved to be just the tip of the iceberg.  Discover subsequently

learned that 6D Global had a written agreement with Wei, pursuant to which he acted as a

"consultant" and was provided with material non-public information about the company.  While

6D Global's most recent 10-K states that NYGG, as a holder of 45% of the Company's stock

"may effectively control the outcome of any stockholder vote," 6D Global nowhere disclosed

that actual day-to-day control of the Company was solely in the hands of Wei, as opposed to 6D

Global's CEO, board of directors and corporate officers.  To the contrary, the 10-K falsely

represented that "the Board oversees the Company's management in the competent and ethical

operation of the Company, and assures that the long-term interests of the stockholders are being

served," while completely failing to inform investors that the board, the CEO and all other

officers were utterly dominated and controlled by Wei, who himself made all decisions (and

through his nominees held a majority of its stock).

34.     Finally, nothing in 6D Global's 10-K and other SEC filings remotely identified

either directly or indirectly the fact 6D Global was in reality just one part of the global Ponzi

scheme masterminded by Wei to profit through stock price manipulation and to siphon funds for

himself and his family and certain co-Defendants.  Likewise, additional material information that

was intentionally omitted from disclosure before the closing of the SPA included that certain of

the Defendants were the subject of a criminal investigation being conducted by the DOJ and the

SEC.  Unfortunately for Discover, that knowledge and information would not surface until just a

few weeks later, upon the filing of the Indictment and SEC Action.

**The Indictment, Arrest and SEC Action.**

35.     On September 8, 2015, the DOJ filed the Indictment against Defendants Wei and

Erbek on charges of stock manipulation and fraud, and on September 10, 2015, Wei was arrested

by the DOJ and the SEC Action was filed against Wei, NYGG and certain other Defendants for

their roles in the scheme to obtain and profit from undisclosed, controlling ownership interests in

several U.S. companies spawned via "reverse Chinese mergers", including 6D Global, that were

actually and secretly controlled by Wei and NYGG.

36.     As detailed in the Indictment and SEC Action, the fraud involving 6D Global

goes back years.

37.     Before becoming 6D Global, CleanTech Innovations, Inc. ("CleanTech"), was a

Chinese windmill manufacturer that retained NYGG to assist with the necessary steps required to

go public in the United States.  (Exhibit C ¶¶ 64, 65).

38.     Wei directed Robert Newman—who represented both NYGG and CleanTech—to

locate a publically traded U.S. shell company for the reverse merger with CleanTech.  Everton

Capital Corporation ("Everton") was selected.  (Exhibit C ¶ 65).

39.     Prior to April 2009, the purchase price was negotiated, Wei approved the price, a

bank account maintained in the name of Four Tong Investments, Ltd. ("Four Tong") wired funds

into Newman's attorney trust account, and the purchase was completed in or about April 2009.

(Exhibit C ¶¶ 33, 65).

40.     Wei's nominee Four Tong is a limited liability corporation incorporated in the

Turks and Caicos Islands, and Tianyi Wei was its sole owner, director, and signatory.  (Exhibit C

¶ 33).

41.     Pursuant to the purchase arrangement, Everton's transfer agent transferred 5,000,000 shares—or 90.89 percent—of Everton's outstanding common stock to a 29-year-old "independent business consultant" from China, Everton's purported new CEO, President, CFO, Treasurer, and Secretary.  Wei, Tianyi Wei, and Michaela Wey indirectly owned most of the remaining 9.11 percent through their foreign nominees.  (Exhibit C ¶ 66).

42.     Newman has purportedly only communicated with Everton's supposed 29-year-old CEO through Wei or through email, never in person or over the telephone.  (Exhibit C ¶ 66).

43.     On July 2, 2010, NYGG facilitated a reverse merger between its client CleanTech and the shell company Everton, which Wei, Tianyi Wei, and Michaela Wey secretly owned through their nominees.  (Exhibit B ¶¶ 10, 12; Exhibit C ¶ 46).

44.     In connection with the merger, Everton's purported new 29-year-old CEO signed an agreement that cancelled his ownership of Everton's 5,000,000 shares for less than a penny per share, significantly below Everton's market value, transforming the remaining shareholders, who were almost exclusively Wei's nominees, into the beneficial owners of more than ten percent of CleanTech.  (Exhibit C ¶ 67).

45.     Defendants' conduct surrounding CleanTech's reverse merger is consistent with its wider fraudulent scheme, in which Wei, along with Tianyi Wei, (1) identified shell companies, (2) purchased ownerships interests using the names of individuals affiliated with Wei, Tianyi Wei, and NYGG, and (3) then transferred the shares of the shell companies to the foreign nominees controlled by Wei, Tianyi Wei, and Michaela Wey.  (Exhibit C ¶ 60).

46.     To further this fraudulent scheme, Wei made or had others make material misstatements and omissions to NASDAQ and the SEC in order to conceal Wei's beneficial ownership of CleanTech.  (Exhibit C ¶¶ 68, 69, 81).

47.     In December 2010, Wei was involved in a transfer of shares of CleanTech to Strong Growth Capital, Ltd. ("Strong Growth"), Han Hua, Ltd. ("Han Hua"), and Roosen Commercial Corp. ("Roosen").  All three entities were nominees controlled directly or indirectly by Wei.  (Exhibit C ¶ 81).

48.     On at least two separate occasions, Wei, with the assistance of Erbek and Tianyi Wei, also manipulated CleanTech's share price in order to maintain it at or above $5.00 per share.  (Exhibit C ¶¶ 91, 99).

49.     The first trades in CleanTech's stock during July 2010 were part of a match trade.  A U.S. brokerage account in Tianyi Wei's name but managed by Wei purchased 1,000 shares for $5.10 from a foreign brokerage account maintained in the name of Guo Sheng, another nominee that lists Tianyi Wei as the owner and signatory.  The purchase price was 70 percent higher than CleanTech's recent $3.00 price per share, and Wei ensured that potential investors were made aware of the drastic price increase.  (Exhibit C ¶¶ 51, 99).

50.     Additionally, a seized February 2011 email from Wei to Erbek revealed Wei's unlawful desire to artificially raise CleanTech's stock price to $5.00 per share.  The email asked Erbek to "[p]lease make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less.  Please make sure this happens right away."  Erbek responded, "Obviously, we need to be careful to give such orders/make such comments."  Swiss accounts managed by Erbek subsequently purchased CleanTech shares in tranches at $4.86 and $4.93.  (Exhibit B ¶ 18; Exhibit C ¶ 100).

51.     With the assistance of Erbek, Wei and Tianyi Wei never disclosed their greater-than five percent beneficial ownership in CleanTech, and Wei never disclosed is greater-than ten percent beneficial ownership interest.  (Exhibit C ¶ 103).

14

52.     According to the SEC, Wei, Tianyi Wei, and Michaela Wey, and all of their nominees are sufficiently interrelated to constitute a group "for the purposes of the filing requirements of Exchange Act Section 13(d) and Regulation 13D-G."  (Exhibit C ¶ 107).

53.     Emails between Wei and Erbek reveal Wei's knowledge of the beneficial ownership disclosure requirement and his active efforts to avoid them.  On July 21, 2010, Wei instructed Erbek to allocate the shares of NYGG Clients between various nominees because of the "five percent limit."  (Exhibit C ¶ 104).

54.     Wei's beneficial ownership in CleanTech exceeded five percent "on or about March 22, 2010, to on or about April 15, 2010, and from on or about December 13, 2010, until at least July 27, 2015."  (Exhibit C ¶ 144).

55.     Tianyi Wey's beneficial ownership in CleanTech exceeded five percent "on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015."  (Exhibit C ¶ 145).

56.     Wei's beneficial ownership in CleanTech exceeded ten percent "on or about March 22, 2010, to on or about April 15, 2010, from on or about December 13, 2010, to on or about September 28, 2014, and from on or about October 7, 2014, to on or about July 27, 2015." (Exhibit C ¶ 160).

57.     CleanTech ultimately became 6D Global in late 2014, and shortly thereafter it was listed and began trading on the NASDAQ under the ticker symbol "SIXD".  (Exhibit C ¶ 46).

58.     As part of its investigation, the DOJ subpoenaed and deposed Wei and his wife Michaela Wey.  They asserted their rights under the Fifth Amendment against self-incrimination.

The DOJ investigation, including into Wei's control and manipulation of 6D Global was being conducted long before Discover and 6D Global executed the SPA.  On information and belief, the investigation and information related to the investigation was known to 6D Global, Tang, the Board and the officers of the company at the time the SPA was executed.  Defendants thus were aware of and took advantage of misrepresentations and omissions in 6D Global's SEC Filings and in the representations made in the SPA to induce Discover to pay $10 million for the Preferred Shares.

59.     Had any of the foregoing been disclosed, as it had to be pursuant to the SPA and under U.S. securities and common law, Discover would never have entered into the SPA.  By inducing Discover to enter the SPA, the Defendants knowingly took advantage of the narrow window of time left before the Indictments and the SEC Action were filed, exposing the Defendants and their scheme for the fraud that it was.

60.     On account of the Indictment and SEC Action, trading in shares of SIXD has been halted by NASDAQ, as of September 12, 2015, and is currently priced at $2.90, almost 50% below the purchase price.

61.     On September 11, 2015, after the filing of the Indictment and the SEC Action, the arrest of Wei, the suspension of trading in 6D Global's stock, and repeated attempts by Discover to speak with Kang at 6D Global, Discover finally reached Kang and asked where the $10 million was.  At first, Defendant Kang lied and said that the full $10 million remained in the bank because the acquisitions the money was supposed to be used for had not closed, and that as a result of the halt on the stock, the acquisitions would not happen.  However, Kang then changed his answer, saying that the money was being depleted daily to fund operations, but that "almost all" of it was still in 6D Global's bank account.

62.     Kang also advised Discover in that conversation that NASAQ had asked 6D Global several questions about the involvement of Wei in the Company.  Kang then told Discover that the Company had a written agreement with Wei to act as a "consultant," pursuant to which he was given material non-public information about the company.  Kang also said that one of the current directors had been appointed to the board by Wei when the Company was known as CleanTech.

63.     On a follow up call on September 15, 2015, Discover informed Kang and Kang's attorney that the SPA must be rescinded and that 6D Global must return the $10 million payment it fraudulently induced.  Instead of responding then or to Discover's subsequent telephone calls, 6D Global sent an email to Discover on September 18, 2015, stating that "we do not agree that the transaction should be rescinded."

**FIRST CLAIM FOR RELIEF**
**Securities Fraud – Misrepresentations**
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

64.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 63 as if fully stated herein.

65.     Representations and warranties in the SPA made by and on behalf of 6D Global were knowingly false at the time they were made.  Specifically:

(a) the representation about compliance with all "requirements to maintain the listing on the Trading Market" was false because 6D Global and all Defendants were aware that the NASDAQ listing had been procured and maintained via false statements and omissions related Wei's secret and absolute control and related stock manipulations;

(b) the Litigation representation was false because all Defendants were aware of an "investigation Pending . . . affecting Company," given the active DOJ and SEC investigations in which controlling person Wei and another Defendant had taken the Fifth and that shortly thereafter resulted in the Indictment and SEC Action and the suspension of trading in the Company's stock;

(c) the Company's most recent 10-K and proxy were materially false and misleading because (i) they do not identify Wei or disclose his total domination and control of 6D Global and its board and officers via his majority holdings both personally and through NYGG and other nominees and (ii) the financial statements do not disclose Wei's siphoning off of funds for personal use or the Company's numerous other compliance and internal control violations; and

(d) the Material Changes representation was violated because there was an "event, occurrence or development that . . . would reasonably be expected to result in, a Material Adverse Effect" given 6D Global and the Defendants' knowledge of the federal investigations, the pending Indictment and SEC Action, and Wei's undisclosed domination and control of the day to day operations of the Company and stock manipulation.

66.     At the time the SPA was executed on August 10, 2015, based on the allegations in the Indictment and SEC Action, Defendants knew these representations were false, but made them with the intent to defraud and induce Discover into purchasing the Preferred Shares.

67.     Discover relied entirely on the representations and warranties contained in the SPA and in the 10-K as incorporated into the SPA.

68.     Discover's reliance was the proximate cause of their injury.

## SECOND CLAIM FOR RELIEF
### Securities Fraud – Omissions
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

69.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 68 as if fully stated herein.

70.     As described above and as incorporated herein, 6D Global failed to disclose its knowledge of the federal investigations, the pending Indictment and SEC Action, and Wei's undisclosed domination and control of the day to day operations of the Company and his ongoing control and manipulation of 6D Global's stock.

71.     By virtue of their insider status, 6D Global and its defendant officers and directors had a duty to disclose all material information before selling the Preferred Shares; despite this knowledge they sold the Preferred Shares to Discover without disclosing this information.

72.     Any reasonable potential purchaser of 6D Global stock would deem these omissions to be material, and would want to know before purchasing stock if one person was committing or had committed fraud with respect to the securities, was exercising complete domination and control over the Company and was manipulating the Company's stock.

73.     Upon information and belief, and based on the Indictment and SEC Action, the Defendants nondisclosure was intentional or reckless.

74.     Discover relied entirely on the representations and warranties contained in the SPA and in the 10-K as incorporated into the SPA.

75.     Discover's reliance was the proximate cause of their injury.

### THIRD CLAIM FOR RELIEF
### Rescission of Contract Made in Violation of the Securities Laws
### - Section 29(b) of the Exchange Act
### (Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)

76.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 75 as if fully stated herein.

77.     The SPA is void (or voidable by Discover) because it was procured by fraudulent misrepresentations and omissions committed by and with the assistance of the Defendants in violation of Sections 10(b) and 29(b) of the Exchange Act.

78.     Upon execution of the SPA, Discover and 6D Global were in privity with one another.

79.     As a member of the investing public, Discover is in the class of persons the Exchange Act was designed to protect.

### FOURTH CLAIM FOR RELIEF
### Fraudulent Inducement
### (Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)

80.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 79 as if fully stated herein.

81.     Defendants made the misrepresentations and omissions described in the First and Second Causes of Action knowing them to be false and material at the time the SPA was executed, with the intention to induce Discover to purchase the Preferred Shares.

82.     Any reasonable investor would have thought the misrepresentations and omissions material information to the decision to purchase the Preferred Shares.

83.     Discover relied on the representations and warranties in purchasing the Preferred Shares, and has been directly injured as a result of the purchase.

## FIFTH CLAIM FOR RELIEF
### Common Law Fraud
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

84.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 83 as if fully stated herein.

85.     Defendants made the misrepresentations and omissions contained in the First and Second Causes of Action knowing them to be false and material at the time the SPA was executed, with the intention to deceive Discover as to the Preferred Shares.

86.     Any reasonable investor would have thought the misrepresentations and omissions material information to the decision to purchase the Preferred Shares.

87.     Discover relied on the representations and warranties in purchasing the Preferred Shares and have been directly injured as a result of the purchase.

## SIXTH CLAIM FOR RELIEF
### Conspiracy to Commit Common Law Fraud
**(Against All Defendants)**

88.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 87 as if fully stated herein.

89.     As described above and as incorporated herein, 6D Global made material misrepresentations and omissions to induce Discover to purchase the Preferred Shares.

90.     The remaining Defendants actively conspired with and aided and abetted and assisted 6D Global in defrauding Discover as described above and participated in the scheme by assisting to secure the SPA and collect the $10 million from Discover.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

91.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 90 as if fully stated herein.

92.     The SPA clearly and expressly provided that 6D Global was "in compliance with all requirements to maintain listing on the Trading Market" and that all of the representations and warranties of 6D Global were "true and correct in all material respects."

93.     Based on the misrepresentations and omissions described above, 6D Global was in breach of the SPA.

94.     Discover performed its part of the SPA in paying $10,000,000 in exchange for the Preferred Shares, and relied on the representations and warranties contained in the SPA to its detriment.

95.     6D Global's breach has directly caused injury to Discover.

**EIGHTH CLAIM FOR RELIEF**
**Indemnification**
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

96.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 95 as if fully stated herein.

97.     The clear and express terms of the SPA (Exhibit A § IV.G)  are clear that 6D Global will indemnify the Discover for any "losses," that "result from (a) any breach of any of the representations, warranties, covenants or agreements made by Company in this agreement or in the other transaction documents and (b) any untrue statement or alleged untrue statement of a

material fact contained in the Registration Statement, Prospectus, Prospectus Supplement, or any information incorporated by reference therein . . . ."

98.     Discover has suffered losses and incurred costs and fees for which it is entitled to indemnification from 6D Global.

**NINTH CLAIM FOR RELIEF**
**Common Law Rescission**
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

99.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 98 as if fully stated herein.

100.    Defendants made the misrepresentations and omissions described above knowing them to be false and material at the time the SPA was executed, with the intention to induce Discover to purchase the Preferred Shares.

101.    Any reasonable investor would have thought the misrepresentations and omissions material information to the decision to purchase the Preferred Shares.

102.    Discover relied on the representations and warranties in purchasing the Preferred Shares and have been directly injured as a result of the purchase.  By virtue of its status as a publicly traded company 6D Global and its defendant officers and directors had a duty to disclose all material information before selling the Preferred Shares and despite this knowledge they sold the Preferred Shares to Discover without disclosing these facts.  6D Global and the Defendants did this with the specific intent of deceiving Discover into purchasing the Preferred Shares.

103.    Discover relied on the representations and warranties contained in the SPA to its detriment and was injured directly as a result of its reliance.

104.    Plaintiff Discover has no adequate remedy at law and is entitled to rescission of the SPA and return of its $10 million.  Plaintiff Discover hereby tenders to GD Global the Preferred Shares.

## TENTH CLAIM FOR RELIEF
### Constructive Trust
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

105.    Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 104 as if fully stated herein.

106.    The SPA created a fiduciary relationship between Discover and 6D Global and its officers and directors and controlling persons, who made representations and warranties in the SPA that Discover relied on in purchasing the Preferred Shares and delivering $10 million to 6D Global and the Defendants.

107.    NASDAQ has since halted trading in the stock of 6D Global, and while Discover is holding illiquid and for all practicable purposes, non-transferable Preferred Shares, 6D Global has been unjustly enriched in the amount of $10 million.

## ELEVENTH CLAIM FOR RELIEF
### Common Law Negligence
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

108.    Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 107 as if fully stated herein.

109.    Defendant 6D Global and the Defendant officers and directors acted in their course of business, as a public company whose stock traded on the NASDAQ, when selling the Preferred Shares to Discover pursuant to the SPA.

110.     As such, Defendants owed Discover a duty of care in their communications with and representations to Discover that were made to guide and induce Discover to enter into the SPA and pay $10 million to 6D Global, and which Discover ultimately did rely on in executing the SPA.

111.     Defendants were negligent in making the material misrepresentations and omissions described above knowing them to be false at the time the SPA was executed, with the intention to induce Discover to purchase the Preferred Shares.

112.     Defendants' negligence directly caused injury to Discover.

### TWELFTH CLAIM FOR RELIEF
### Common Law Misrepresentation
**(Against Defendants 6D Global, NYGG, Wei, Kang, Szynkowski, Hartung, Kaufman, McEwen, Saxena)**

113.     Plaintiff repeats and realleges each of the allegations made in Paragraphs 1 through 112 as if fully stated herein.

114.     Defendants, by and through the SPA and the misrepresentations and omissions committed in relation thereto, created a special relationship with Discover imposing a duty on Defendants to impart correct information to Discover.

115.     As stated above, critical representations were misstated and material information omitted related to the Weis' domination and control of the Company and stock manipulation, and the ongoing investigations related thereto.

116.      Discover relied on Defendants' misrepresentations and omissions in entering into the SPA, and would not have executed the SPA but for Defendants' misrepresentations and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Discover respectfully requests judgment against Defendants as follows:

i. compensatory damages in an amount to be determined at trial;

ii. punitive damages in an amount to be determined at trial;

iii. rescission of the SPA;

iv. an order requiring Defendants to return to Discover the $10,000,000 payment for 6D Global preferred shares;

v.  all of the costs of suit (including attorneys' fees and costs); and

vi. granting such other and further relief as this Court deems just and proper.

Dated:   New York, New York
September 28, 2015

GIBSON, DUNN & CRUTCHER LLP


By: */s Robert F. Serio*
    Robert L. Weigel
    Robert F. Serio
    Andrew R. Keats

200 Park Avenue
New York, NY  10166-0193
Telephone:     212-351-4000
Facsimile:     212-351-4035

*Attorneys for Plaintiff Discover Growth Fund*