UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DISCOVER GROWTH FUND,

             Plaintiff,

   -against-

6D GLOBAL TECHNOLOGIES INC.; NEW
YORK GLOBAL GROUP, INC.; NYGG
(ASIA), LTD.; BENJAMIN TIANBING WEI
A/K/A BENJAMIN WEY; TEJUNE KANG;
MARK SYNKOWSKI; ADAM HARTUNG;
DAVID S. KAUFMAN; TERRY MCEWEN;
ANUBHAV SAXENA; TIANYI WEI;
MICHAELA WEI; SEREF DOGAN ERBEK,

            Defendants.

--------------------------------------------------------x

        **15-cv-07618**

### DECLARATION OF ROBERT F. SERIO IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER OF ATTACHMENT

      ROBERT F. SERIO, an attorney duly licensed to practice before the courts of this State,

hereby declares pursuant to 28 U.S.C. §1746 that the following is true and correct:

      1.      I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, attorneys for

Plaintiff Discover Growth Fund ("Discover").  I am fully familiar with the facts set forth in this

Affirmation.

      2.      I respectfully submit this Affirmation in support of Discover's ex parte

application for an order to show cause why an order should not be issued (i) granting Discover

an order of attachment against defendant 6D Global Technologies, Inc. ("6D Global") pursuant

to FRCP 64 and CPLR §§ 6201, 6210 and 6212, and (ii) granting Discover a temporary

restraining order pursuant to CPLR § 6210, and (iii) granting Discover such other relief as this Court deems just and proper.

**The Stock Purchase Agreement and 6D Global's Representations and Warranties**

3.  On August 10, 2015, Discover entered into a Stock Purchase Agreement ("SPA")[1] with 6D Global, a publicly traded company trading on the NASDAQ under the ticker symbol "SIXD," pursuant to which Discover agreed to pay $10,000,000 in exchange for 1,088 shares of Series A Redeemable Convertible Preferred Stock of 6D Global (the "Preferred Shares"), convertible into Common Stock at $5.25 per share.  Upon execution of the SPA, Discover delivered to 6D Global the sum of $10,000,000 by wire transfer and received the Preferred Shares.  (Declaration of Miles Walton ("Walton Dec."), ¶ 2).

4.  On September 25, 2015, I directed a search of the New York Department of State Website.  6D Global is not registered with the Department of State.  Also, upon information and belief, there are no known claims or counterclaims against Discover that exist or could be brought by any of the defendants.

5.  To induce Discover to enter into the SPA, 6D Global made representations in the SPA that it knew to be false when they were made, and omitted critical information it knew to be material, and willfully concealed the truth by rushing to close the transaction before defendant Benjamin Tianbing Wei's arrest.  Among other things, 6D Global made the material false representations and the material omissions discussed below.

6.  As a condition under the SPA to securing Discover's purchase of the Preferred Shares, 6D Global asserted not only that it was "in compliance with all requirements to maintain listing on the Trading Market" (Exhibit A § II.C.2) and that all of "[t]he representations and

---

[1]  Attached hereto as Exhibit A is a true and correct copy of the Stock Purchase Agreement dated August 10, 2015.

warranties of [6D Global] . . . set forth in this Agreement are true and correct in all material respects" (Exhibit A § II.C.3), but more specifically, and among other representations and warranties, that:

(a) **Litigation.**  There is no Action pending or, to the knowledge of the Company, threatened, which would reasonably be expected to result in a Material Adverse Effect.  Neither Company nor any Subsidiary, nor to the knowledge of Company any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of Company, there is not pending or contemplated, any investigation by the Commission involving Company or any current or former director or officer of Company. (Exhibit A § III.B.5).

(b) **Public Reports; Financial Statements.** Company has filed all required Public Reports for the one year preceding the Effective Date. As of their respective dates or as subsequently amended, the Public Reports complied in all material respects with the requirements of the Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, as applicable, and none of the Public Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Company included in the Public Reports, as amended, comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with

respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments. (Exhibit A § III.B.3).

(c) **Material Changes.**  Since the end of the most recent year for which an Annual Report on Form 10-K has been filed with the Commission, (a) there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect  . . . (Exhibit A § III.B.4).

(d) **Compliance.**  Neither Company nor any Subsidiary (a) is in material default under or in material violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by Company or any Subsidiary under), nor has Company or any Subsidiary received notice of a claim that it is in material default under or that it is in material violation of, any indenture, loan or credit agreement or any other similar agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any order of any court, arbitrator or governmental body, or (c) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws

4

applicable to its business, except in each case as would not reasonably be expected to have a Material Adverse Effect. (Exhibit A § III.B.8).

(e) **Sarbanes-Oxley; Internal Accounting Controls.** Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002, which are applicable to it as of the date of the Closing. Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the ineffectiveness of Company's disclosure controls and procedures based on their evaluations as of the evaluation date. Since the date of the most recently filed periodic report under the Exchange Act, there have been no significant changes in Company's internal accounting controls or its disclosure controls and procedures or, to Company's knowledge, in other factors that could materially affect Company's internal accounting controls or its disclosure controls and procedures. (Exhibit A § III.B.14).

(f) **Listing and Maintenance Requirements.** The Common Stock is registered pursuant to Section 12 of the Exchange Act, and Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has Company received any notification that the Commission is contemplating terminating such registration. Company has not, in the 12 months preceding the Effective Date, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that Company is not in compliance with the listing or maintenance requirements of such Trading Market. Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in

compliance with all such listing and maintenance requirements.  (Exhibit A §

III.B.17).

(g) **Foreign Corrupt Practices.**  Neither Company, nor to the knowledge of

Company, any agent or other person acting on behalf of Company, has (a) directly

or indirectly, used any corrupt funds for unlawful contributions, gifts,

entertainment or other unlawful expenses related to foreign or domestic political

activity, (b) made any unlawful payment to foreign or domestic government

officials or employees or to any foreign or domestic political parties or campaigns

from corporate funds, (c) failed to disclose fully any contribution made by

Company, or made by any person acting on its behalf of which Company is

aware, which is in violation of law, or (d) violated in any material respect any

provision of the Foreign Corrupt Practices Act of 1977, as amended.  (Exhibit A §

III.B.20).

7.    On information and belief, contrary to the Trading Market representation, 6D

Global was aware that the NASDAQ listing had been procured and maintained via Wei's stock

manipulations, thus the representation about compliance with all "requirements to maintain the

listing on the Trading Market" was false.  Contrary to the Litigation representation, all

defendants were aware of an "investigation pending . . . affecting Company", to wit the DOJ and

SEC investigations in which controlling person Wei had taken the Fifth and that would result in

the Indictment[2] and SEC Action[3] and the suspension of trading in the Company's stock.

Representations in the Company's most recent 10-K[4] and proxy statement were materially

---

[2]  Attached hereto as Exhibit B is a true and correct copy of the Indictment dated September 8, 2015.
[3]  Attached hereto as Exhibit C is a true and correct copy of the SEC Complaint dated September 10, 2015.
[4]  Attached hereto as Exhibit D is a true and correct copy of the relevant pages of the Company's Form 10-K
dated March 30, 2015.

misleading because (i) they do not identify Wei or disclose his total domination and control of the Company, its board and its officers via his 6D Global majority holdings both personally and through defendants NYGG, NYGG-Asia and other nominees and (ii) the 6D Global financial statements contained in the Company's SEC filings do not disclose the foregoing or Wei's siphoning off of funds or the Company's numerous other compliance and internal control violations.  Contrary to the Material Changes representation, 6D Global was aware of an "event, occurrence or development that . . . would reasonably be expected to result in, a Material Adverse Effect" defined to include "any material adverse effect on . . . (b) the results of operations, assets, business or financial condition of the Company and the subsidiaries, taken as a whole, which is not disclosed in the Public Reports prior to the Effective Date . . . ."  Again, 6D Global knew that the investigation into Wei, his stock manipulations, siphoning of funds, and the imminent Indictment, SEC Action and NASDAQ delisting were individually and collectively material information of circumstances expected to result in a materially adverse effect that were not disclosed to Discover prior to, and in connection with, the execution of the SPA.

8.     Also, in connection with and to willfully conceal the true facts so that Discover would close on its purchase of the Preferred Shares, 6D Global, and specifically its Chairman and CEO Tejune Kang, represented to Discover that the $10,000,000 purchase price was needed for 6D Global to fund two separate acquisitions, each valued at $10 million, each acquisition to be funded half in cash and half in stock.  (Walton Dec. ¶ 4).  The negotiations were fast-paced, pushed by Kang and 6D Global's eagerness to close and secure the $10 million in financing, purportedly to enable it to pursue the pending acquisitions immediately upon receipt of funds.

9.     In reality, however, 6D Global needed to close the SPA quickly because the DOJ's investigation of Wei and NYGG was wrapping up and the filing of the Indictment and

SEC Action was imminent. (*See generally* Exs. B and C.) 6D Global knew that once the Indictment and SEC Action were filed, it would be impossible for 6D Global to secure the financing needed to stay in business. Given the absolute and total control Wei exerted over Kang and 6D Global, it is clear that Wei, with the knowledge and assistance of Kang and 6D Global (among others), was looking to cash in one last time before his Ponzi scheme was revealed.

10.     Events began to turn, shortly after executing the SPA, when Discover received an email from 6D Global's Chairman Tejune Kang, requesting a meeting in the offices of Discover's investment advisor. Kang informed Discover that he was bringing a representative of NYGG Asia, 6D Global's largest shareholder. (Kirkland Dec. ¶ 1.)[5]

11.     At the meeting on August 18, 2015, Tejune Kang introduced Benjamin Wei as his controlling stockholder, saying, "basically, I work for him." (Kirkland Dec. ¶ 2.) Wei, whom Discover had never heard of and never seen before, proceeded to inform Discover, for the first time, that he controlled defendant NYGG, and that through NYGG he controlled all of 6D Global, its stock, and its operations, and that Kang worked for him. (*Id.*) Wei further stated that there was "no real public float" and that virtually all free trading shares of the company were controlled by him and his "friends in China." (*Id.*) He further explained that the rebound in stock price that had occurred for no apparent reason shortly after Discover entered into the SPA was caused by Wei and his group, further proving his control over the stock of 6D Global. (*Id.*) Wei told Discover, in the presence of Kang, that if Discover ever wanted to sell its shares, it should not sell them in the open market but should instead sell them directly to Wei or to whom he directed the shares be sold. (*Id.*).

---

[5]   6D Global's proxy statement, filed in connection with issuance of the Preferred Shares, and incorporated into the 6D Global's most recent Form 10-K, as filed with the SEC on March 19, 2015, identifies NYGG Asia as holder of approximately 45% of the 6D Global's outstanding shares. (Ex. D, p. 13)

12.     This meeting proved to be just the tip of the iceberg.  Discover subsequently learned that 6D Global had a written agreement with Wei, pursuant to which he acted as a "consultant" and was provided with material non-public information about the company.  (*Id.*) While 6D Global's most recent 10-K states that NYGG, as a holder of 45% of the Company's stock "may effectively control the outcome of any stockholder vote," 6D Global nowhere disclosed that actual day-to-day control of the Company (and a majority of its stock) was solely in the hands of Wei, as opposed to 6D Global's CEO, board of directors and corporate officers. To the contrary, the 10-K falsely represented that "the Board oversees the Company's management in the competent and ethical operation of the Company, and assures that the long-term interests of the stockholders are being served," while completely failing to inform investors that the board, the CEO and all other officers were utterly dominated and controlled by Wei, who himself made all decisions.  (*Id.* Ex. D).

13.     Finally, nothing in 6D Global's 10-K and other SEC filings remotely identified either directly or indirectly the fact 6D Global was in reality just one part of the global Ponzi scheme masterminded by Wei to manipulate stock prices, commit securities fraud and siphon funds for himself and his family and certain co-defendants.  Likewise, additional material information that was intentionally omitted from disclosure before the closing of the SPA included that certain of the defendants were the subject of a criminal investigation being conducted by the DOJ and the SEC.  Unfortunately for Discover, that knowledge and information would not surface until just a few weeks later, upon the filing of the Indictment and SEC Action.  (*Id.*)

**The Indictment, Arrest and SEC Action.**

14.     On September 8, 2015, the DOJ filed the Indictment against defendants Wei and

Erbek on charges of stock manipulation and fraud, and on September 10, 2015, Wei was arrested

by the DOJ and the SEC Action was filed against Wei, NYGG and certain other defendants for

their roles in the scheme to obtain and profit from undisclosed, controlling ownership interests in

several U.S. companies spawned via "reverse Chinese mergers", including 6D Global, that were

actually and secretly controlled by Wei and NYGG.  (Exs. B & C.)

15.     As detailed in the Indictment and SEC Action, the fraud involving 6D Global

goes back years.  Before becoming 6D Global, CleanTech Innovations, Inc. ("CleanTech"), was

a Chinese windmill manufacturer that retained NYGG to assist with the necessary steps required

to go public in the United States.  (Ex. C ¶¶ 64, 65).

16.     Wei located a publicly traded U.S. shell company for the reverse merger with

CleanTech.  Everton Capital Corporation ("Everton") was selected.  (*Id.* ¶ 65).  The purchase

was made by a Chinese company dominated and controlled by defendants Wei and Tianyi Wei.

(*Id.* ¶¶ 33, 65, 33.)  The entirety of Everton's and later CleanTech's stock was owned or

controlled by defendants Wei, Tianyi Wei, and Michaela Wei both directly and indirectly

through their foreign nominees, with the help of defendant Erbek.  (*Id.* ¶ 66).  Taking advantage

of their domination and control, the Weis engaged in a scheme to manipulate CleanTech's share

price in order to maintain it at or above $5.00 per share.  (*Id.* ¶¶ 91, 99).

17.     The first trades in CleanTech's stock during July 2010 were part of a match trade.

A U.S. brokerage account in Tianyi Wei's name but managed by Wei purchased 1,000 shares for

$5.10 from a foreign brokerage account maintained in the name of Guo Sheng, another nominee

that lists Tianyi Wei as the owner and signatory.  The purchase price was 70 percent higher than

CleanTech's recent $3.00 price per share, and Wei ensured that potential investors were made aware of the drastic price increase. (*Id.* ¶¶ 51, 99).

18.     Additionally, a seized February 2011 email from Wei to Erbek revealed Wei's unlawful desire to artificially raise CleanTech's stock price to $5.00 per share. The email asked Erbek to "[p]lease make sure the trader buys the stock at $5 per share, stay at $5 per share bid price, not less. Please make sure this happens right away." Erbek responded, "Obviously, we need to be careful to give such orders/make such comments." Swiss accounts managed by Erbek subsequently purchased CleanTech shares in tranches at $4.86 and $4.93. (Ex. B ¶ 18; Ex. C ¶ 100). With the assistance of Erbek, the Weis' domination and control of the company's stock was never disclosed. (Ex. C ¶¶ 68, 69, 81). Emails between Wei and Erbek reveal Wei's knowledge of the beneficial ownership disclosure requirement and his active efforts to avoid it. (*Id.* ¶¶ 104, 144-5, 160).

19.     CleanTech ultimately became 6D Global in late 2014, and shortly thereafter it was listed and began trading on the NASDAQ under the ticker symbol "SIXD". (*Id.* ¶ 46).

20.     On account of the Indictment and SEC Action, trading in shares of SIXD has been halted by NASDAQ, as of September 12, 2015, and is currently priced at $2.90, almost 50% below the purchase price.

21.     As part of its investigation, the DOJ subpoenaed and deposed Wei and his wife Michaela Wei. They asserted their rights under the Fifth Amendment against self-incrimination. (Ex. C ¶¶ 16, 22.) The DOJ investigation, including into Wei's control and manipulation of 6D Global, was being conducted long before Discover and 6D Global executed the SPA. On information and belief, the investigation and information related to the investigation was known

to 6D Global, Tang, the board and the officers of the Company at the time the SPA was executed.

22.     Had any of the foregoing been disclosed, as it had to be pursuant to the SPA and under U.S. securities and common law, Discover would never have entered into the SPA. (Walton Dec. ¶ 6.) By inducing Discover to enter the SPA, 6D Global knowingly took advantage of the narrow window of time left before the Indictments and the SEC Action were filed, exposing the 6D Global scheme for the fraud that it was.

**6D Global's Dissipation of Assets.**

23.     After the filing of the Indictment and the SEC Action, the arrest of Wei, and the suspension of trading in 6D Global's stock, Discover repeatedly tried to contact 6D Global. (Kirkland Dec. ¶ 3.) On September 11, 2015, in a telephone conversation, Kang advised Discover that NASAQ had asked 6D Global several questions about the involvement of Wei in the Company. (*Id.*) Kang said, for the first time, that 6D Global had a written agreement with Wei to act as a "consultant," pursuant to which he was given material non-public information about the Company. (*Id.*) He also said that one of the current directors had been appointed to the board by Wei when the Company was CleanTech. (*Id.*)

24.     Discover then asked Kang where its $10 million was. (*Id.* ¶ 4.) Kang said the money was still in the bank, that the acquisitions the money was supposed to be used for had not closed, and that as a result of the halt on the stock by NASDAQ, the acquisitions were now dead. (*Id.*) Kang then changed his answer, saying that the money was being depleted daily to fund operations, but that "almost all" of it was still in 6D Global's bank account. (*Id.*) Discover told Kang that it was still attempting to investigate the true facts, and that they would have to have "a very serious conversation" before any more money was dissipated. (*Id.*) Kang responded, "I

understand." 6D Global has refused to rescind the transaction and refund Discover's $10 million.

25.     Earlier today I placed a call to K&L Gates LLP, counsel for 6D Global, to give them notice that today we would be seeking the present order to show cause, temporary restraining order and write of attachment, and I emailed them the papers.  No prior request for the relief sought herein has been made to any court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 28th day of September, 2015.

Robert F. Serio