UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
DISCOVER GROWTH FUND,

                     Plaintiff,

    - against -

6D GLOBAL TECHNOLOGIES INC.; NEW
YORK GLOBAL GROUP, INC.; NYGG
(ASIA), LTD,; BENJAMIN TIANBING WEI
A/K/A BENJAMIN WEY; TEJUNE KANG;
MARK SYNKOWSKI; ADAM HARTUNG;
DAVID S. KAUFMAN; TERRY MCEWEN;
ANUBHAV SAXENA; TIANYI WEI;
MICHAELA WEI ; SEREF DOGAN ERBEK,

                     Defendants.
---------------------------------------------------------------x

Civil Action No.: 15-cv-7618

**DECLARATION OF TEJUNE KANG**

I, TEJUNE KANG, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Chief Executive Officer of Defendant 6D Global Technologies Inc. ("6D Global"), and am also named individually as a defendant in this action.

2. I submit this Declaration based on my personal knowledge in support of 6D Global's opposition to the application of Plaintiff Discover Growth Fund ("Discover") for an order of attachment and in support of 6D Global's cross-motion to stay these proceedings and compel arbitration.

**Background Facts**

3. In 2004, I founded a company called Initial Koncepts, Inc. ("Initial Koncepts"), a consulting firm specializing in providing information technology and computing solutions to a wide range of corporate clients, including Apple, Boeing, Hewlett-Packard, Dolby, and AT&T, among others. At some point between approximately 2006-2007, Initial Koncepts began using the "d/b/a" of "Six Dimensions" and later became Six Dimensions, Inc. (collectively, "Six

Dimensions").[1]  Six Dimensions remains the name of one of 6D Global's wholly-owned operating subsidiaries.

4.  Since founding Six Dimensions, I have continually worked to grow and develop the business. Those efforts led to exploration of various merger and other financing options, with the ultimate goal of becoming a publicly traded company listed by NASDAQ.

**The CleanTech Merger**

5.  In November 2013, Six Dimensions engaged Mr. Albert Lee – an acquaintance of mine – to identify potential merger targets. In March 2014, Mr. Lee introduced Six Dimensions to a company called CleanTech Innovations, Inc. ("CleanTech"). Among other things, Mr. Lee explained to me that CleanTech invested in wind turbine projects in China and could be a potential merger candidate for Six Dimensions because CleanTech was already publicly listed on NASDAQ and would be willing to divest its operations so that the resulting business would be that of Six Dimensions, only. At the time, Six Dimensions was also considering other publicly-traded companies on NASDAQ and over-the-counter as merger possibilities, as well as other financing options through private equity. Given that CleanTech was already publicly listed on NASDAQ, I agreed that it seemed like an attractive merger candidate for Six Dimensions that would enable Six Dimensions to achieve its goal of becoming publicly-traded.

6.  With that in mind, in April 2014, I attended a meeting with representatives of CleanTech, Six Dimensions, and a company called NYGG (Asia) Ltd. ("NYGG Asia"), who I understood to be one of CleanTech's primary creditors at the time. Legal counsel for all three companies attended that meeting as well. Mr. Benjamin Wey, who I understand has also been named as a defendant in this action, also attended the April 2014 meeting. I had never met, or

---

[1] For ease of reference, I will refer to both Initial Koncepts and Six Dimensions, Inc. as "Six Dimensions."

- 2 -

spoken with, Mr. Wey until approximately March 2014, shortly before the April 2014 meeting between and among CleanTech, Six Dimensions, and NYGG Asia.

7.  At the April 2014 meeting, the various attendees discussed the possibility of a merger between CleanTech and Six Dimensions. After that meeting, the parties entered into merger negotiations.

8.  On September 29, 2014, the merger was consummated after the necessary disclosures were filed with the Securities and Exchange Commission ("SEC"). Pursuant to the merger, Six Dimensions became "6D Global" and CleanTech divested its prior operations in the wind turbine business.

9.  As one of CleanTech's primary creditors, NYGG Asia was also involved in the merger and became a significant holder of shares of 6D Global's common stock. At all times after 6D Global began operations, I communicated principally with Mr. Roger Li regarding matters related to NYGG Asia. I understand Mr. Li to be NYGG Asia's Managing Director and beneficial owner.

### 6D Global Becomes Publicly-Listed and Continues to Seek Growth Opportunities

10.  As I have already noted, from Six Dimensions' perspective, the principal business rationale for the CleanTech merger was to ensure that Six Dimensions could continue to grow and become a publicly listed company. To that end, the merger with CleanTech enabled the newly named 6D Global to be publicly-traded on NASDAQ shortly after the merger was consummated.

11.  Since becoming a publicly listed company, 6D Global has continued to seek out growth opportunities, particularly strategic acquisitions, in an effort to continue to expand its

business, better service its existing global clients, and ultimately begin generating more substantial revenues for its shareholders.

12.   With these goals in mind, I believed it was essential for me, as the CEO of a small publicly traded start-up, to make every effort to try and raise capital for 6D Global that would enable the company to pursue potentially strategic acquisitions and support its growing operations. Accordingly, in early 2015, I contacted a number of potential leads who I hoped could provide 6D Global with additional capital. As part of those efforts, I contacted Mr. Wey, who I had met for the first time in connection with the CleanTech merger, because I viewed him as someone who could connect 6D Global to potential investors and provide 6D Global with business advice. After discussing the matter, Mr. Wey indicated that he would be willing to act as a consultant for 6D Global and use his network of contacts to connect 6D Global with potential investors. This arrangement was not reflected in any written consulting agreement between Mr. Wey and 6D Global, nor did 6D Global and Mr. Wey ever enter into any agreement – written or otherwise – whereby Mr. Wey would be paid a finder's fee or otherwise receive compensation for acting as a consultant for 6D Global.

13.   Since the CleanTech merger closed in September 2014, I consulted with Mr. Wey about various potential acquisitions for 6D Global. 6D Global did not compensate Mr. Wey for any of the meetings that he arranged, nor did 6D Global pay Mr. Wey a "finder's fee" of any kind.

### Discover Invests in 6D Global

14.   Separate and apart from my contacts with Mr. Wey, in August 2015, 6D Global entered into discussions with Discover over a possible investment in 6D Global. Those conversations culminated in the Stock Purchase Agreement ("SPA"), dated August 10, 2015, by

and between Discover and 6D Global, pursuant to which Discover invested $10,000,000 in 6D Global in exchange for 1,088 shares of Preferred Stock in the company.

15. In connection with the negotiation and signing of the SPA, Discover circulated an initial draft of the SPA to 6D Global and subsequently indicated that it would accept little to no comments or revisions to its form SPA. Further, during the negotiations leading up to the SPA, Discover rejected 6D Global's offer to provide Discover with access to material non-public information about 6D Global pursuant to a standard non-disclosure agreement. Instead, Discover made clear that it did not want to receive any non-public information about 6D Global as part of its diligence process leading up to execution of the SPA, so that Discover could be free to trade 6D Global's stock soon after signing the SPA. As far as I am aware, throughout the negotiation and signing of the SPA, Discover was given full access to all information regarding 6D Global that it requested.

16. Shortly thereafter, on August 18, 2015, I traveled to the United States Virgin Islands (St. Thomas) to meet with Discover, now a significant investor in 6D Global. At the time, I understood the purposes of that meeting with Discover to be to get to know Discover better, educate them about 6D Global, and discuss future potential financing and investment opportunities that would continue 6D Global's growth efforts. Accordingly, I first sought out Mark Szynkowski, 6D Global's Chief Financial Officer, to accompany me to the United States Virgin Islands. Mr. Szynkowski was not available, however, so I then sought out Jeff Meyerson, Senior Managing Director of Capital City Partners, who was the placement agent for the Discover transaction and introduced Discover to 6D Global. As Jeff was also unavailable, I thought of Mr. Wey and his apparently wide network of financial contacts, and decided to invite

Mr. Wey to the meeting with Discover in the hopes that, among other things, he could provide useful insight at an investor meeting with Discover.

17. With respect to that August 18, 2015 meeting, I have reviewed the September 25, 2015 Declaration of John Kirkland, one of Discover's principals and an experienced lawyer, submitted along with Discover's application for an attachment in this action. In sum, Mr. Kirkland's Declaration is materially inaccurate in its description of the August 18, 2015 meeting in most respects. Among other things, I did not hear Mr. Wey claim that he "controlled" either NYGG Asia or 6D Global at any point during that August 18, 2015 meeting. Indeed, since I first met him in 2014, Mr. Wey has never dictated the operations of 6D Global or its decision-making. Further, Mr. Wey has never been an officer, director, or shareholder of 6D Global. And I have never known Mr. Wey to be an officer, director, or shareholder of NYGG Asia.

18. I do recall that Mr. Wey told Mr. Kirkland that he could put Mr. Kirkland in touch with investors who might be interested in purchasing Discover's stock if Discover ever decided to sell it. However, this did not seem to be concerning to anyone at the meeting.

19. To the best of my recollection, Mr. Kirkland did not express any shock or concern about Mr. Wey during the August 18, 2015 meeting in the Virgin Islands, nor did Mr. Kirkland tell me that Mr. Wey had claimed he "controlled" NYGG Asia and/or 6D Global. I believe that if Mr. Kirkland had understood Mr. Wey to be making the statements that Mr. Kirkland now alleges, Mr. Kirkland would have spoken up about it in the meeting. At the very least, I would have expected him to contact me and discuss any concerns with what Mr. Wey purportedly said at the August 18, 2015 meeting. However, between August 18, 2015 and September 8, 2015, Mr. Kirkland never raised any concerns to me regarding Mr. Wey, NYGG Asia, or 6D Global.

20.    In August 2015, after the SPA was executed, I wanted to purchase shares in 6D Global stock because, pursuant to 6D Global's insider trading policy, a window for stock purchases had opened following 6D Global's filing of its Form 10-Q for the period ended June 30, 2015, and because I also believed that a significant purchase of stock by the CEO would reflect my confidence in the company's future. Although I tried to secure a loan from commercial institutions including Merrill Lynch, UBS, Morgan Stanley, and Raymond James, I was unable to do so. Given the limited time frame for me to purchase 6D Global stock, I borrowed $100,000 from Michaela Wey, who is the wife of Benjamin Wey, to purchase shares of 6D Global on the open market. It is also my understanding that Mrs. Wey owns 109 shares of 6D Global's common stock. The term of the loan expires on December 31, 2015, and it bears interest in the amount of 4%. I have never sold a share of 6D Global's common stock.

21.    In September 2015, I learned of the indictment pending in this Court against Mr. Wey and Mr. Wey's arrest. I understand that this indictment and the separate complaint filed by the SEC against Mr. Wey relate largely to conduct that occurred from 2006-2011, at least two years before I (or anyone else from Six Dimensions) was introduced to Mr. Wey. Needless to say, the allegations against Mr. Wey came as a complete shock to me. Given that the first time that Mr. Kirkland expressed any concern to me about Mr. Wey was after learning of Mr. Wey's indictment and arrest in September 2015, I expect that the indictment against Mr. Wey also came as a shock to Mr. Kirkland.

22.    After learning of Mr. Wey's arrest, I spoke to Mr. Wey via phone and advised Mr. Wey that 6D Global was severing ties with him. I have not spoken to or otherwise communicated with Mr. Wey since.

23. Finally, I would note that, under the terms of the SPA, Discover could reap significant profits from a decline in the price of 6D Global's stock. Upon information and belief, this action may be a scheme to suppress 6D Global's stock price for Discover's financial benefit. Accordingly, I have asked 6D Global's attorneys to reserve 6D Global's right to assert appropriate counterclaims against Discover on those grounds in a future arbitration.

I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the foregoing is true and correct.

Executed:   October 2, 2015
            New York, New York

_____
Tejune Kang