UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

DISCOVER GROWTH FUND,

                      Plaintiff,

       - against -

6D GLOBAL TECHNOLOGIES INC.; NEW
YORK GLOBAL GROUP, INC.: NYGG
(ASIA), LTD,; BENJAMIN TIANBING WEI
A/K/A BENJAMIN WEY; TEJUNE KANG;
MARK SYNKOWSKI; ADAM HARTUNG;
DAVID S. KAUFMAN; TERRY MCEWEN;
ANUBHAV SAXENA; TIANYI WEI;
MICHAELA WEI ; SEREF DOGAN ERBEK,

                      Defendants.

------------------------------------------------------------x

Civil Action No.: 15-cv-7618 (PKC)

 

**DEFENDANT 6D GLOBAL TECHNOLOGIES INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO ORDER TO SHOW CAUSE FOR AN ORDER OF ATTACHMENT
AND A TEMPORARY RESTRAINING ORDER, AND IN SUPPORT OF CROSS-
MOTION TO COMPEL ARBITRATION AND STAY THE PROCEEDINGS**

K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

*Attorneys for Defendant 6D Global Technologies Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND....................................................................................4

    Nature of 6D Global's Business .....................................................................4

    6D Global's Corporate History........................................................................6

    6D Global Begins Expansion Efforts .............................................................7

    Discover Invests in 6D Global.........................................................................8

    Stock Purchase Agreement .............................................................................9

    August 18 Meeting ........................................................................................11

    DOJ and SEC Actions ..................................................................................11

    No Dissipation of Assets ..............................................................................12

ARGUMENT.........................................................................................................13

I.     THE SPA'S BROAD, EXCLUSIVE, VALID, AND BINDING ARBITRATION
    AGREEMENT, WHICH DISCOVER DRAFTED, REQUIRES ARBITRATION
    OF THIS DISPUTE. .......................................................................................13

    A.     Strong federal policy favors arbitration of the parties' dispute .............13

    B.     The SPA's arbitration agreement is enforceable under the FAA ..........14

    C.     By its terms, the SPA's arbitration clause requires that any questions of
        arbitrability must be decided by the arbitrator.......................................15

    D.     In any event, the SPA's broad arbitration clause covers the underlying
        disputes between Discover and 6D Global ............................................16

    E.     For the avoidance of doubt, Discover cannot credibly claim that the SPA's
        arbitration clause was itself induced by fraud .......................................17

II.     DISCOVER IS NOT ENTITLED TO AN ATTACHMENT OF ANY OF 6D
    GLOBAL'S ASSETS .....................................................................................18

    A.     Standard for granting attachment...........................................................19

B.     Discover fails to prove any security risk justifying an attachment under CPLR 6201(1) ..........................................................................................20

C.     Discover has failed to demonstrate that 6D Global is secreting any assets out of New York as required by CPLR 6201(3) .......................................................21

D.     Discover is not likely to succeed on the merits of either its breach of contract or its securities fraud claims, nor any of its other common law claims ................................................................................................................22

E.     6D Global reserves its right to assert counterclaims against Discover in a future arbitration .........................................................................................24

CONCLUSION .............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) ................................................................................................16

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) ...................................................................................................17

*DLJ Mortgage Capital, Inc. v. Kontogiannis*,
   594 F. Supp. 2d 308 (E.D.N.Y. 2009) ...............................................................19, 22

*Elliott Associates, L.P. v. Republic of Peru*,
   948 F. Supp. 1203 (S.D.N.Y. 1996) .........................................................................18

*Emilio v. Sprint Spectrum L.P.*,
   508 F. App'x 3, 5 (2d Cir. 2013) ..............................................................................15

*Etalon Imob S.R.L. v. Schoenbach*,
   2012 WL 4741595 (S.D.N.Y. Oct. 3, 2012) ......................................................20, 21

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) .............................................................................................15, 23

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   371 F. Supp. 2d 571 (S.D.N.Y. 2005) ......................................................................15

*Green Tree Fin. Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000) .....................................................................................................14

*Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*,
   246 F.3d 219 (2d Cir. 2001) ......................................................................................14

*Katz v. Cellco P'ship*,
   --- F.3d ---, 2015 WL 4528658 (2d Cir. July 28, 2015) ...........................................18

*Marklin v. Drew Props. Corp.*,
   280 F. Supp. 176 (S.D.N.Y. 1967) ...........................................................................19

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
   460 U.S. 1 (1983) .......................................................................................................14

*PaineWebber Inc. v. Bybyk*,
   81 F.3d 1193 (2d Cir. 1996) ......................................................................................15

*Rent-A-Center, West, Inc. v. Jackson,*
    561 U.S. 63 (2010)..................................................................................17, 18

*Rep. of Ecuador v. Chevron Corp.,*
    638 F.3d 384 (2d Cir. 2011) ...............................................................14

*Sea Trade Co. v. FleetBoston Fin. Corp.,*
    2008 WL 161239 (S.D.N.Y. Jan. 15, 2008) ........................................18

*Shearson/Am. Express Inc. v. McMahon,*
    482 U.S. 220 (1987).............................................................................17

*Silverman v. Miranda,*
    2015 WL 4486296 (S.D.N.Y. July 22, 2015) .....................................21

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern., Inc.,*
    198 F.3d 88 (2d Cir. 1999) .................................................................14

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    559 U.S. 662 (2010).............................................................................16

## Statutes

9 U.S.C. § 201...........................................................................................13

9 U.S.C. § 206...........................................................................................14

N.Y. CPLR § 6201.............................................3, 18, 19, 20, 21, 22, 24

N.Y. CPLR § 6212...............................................................................18, 19

N.Y. CPLR § 6223......................................................................................19

N.Y. CPLR § 7502......................................................................................18

## Other Materials

1 Gary B. Born, *International Commercial Arbitration* (2d ed. 2014) .........................................17

## PRELIMINARY STATEMENT

Plaintiff Discover Growth Fund ("Discover") fails to satisfy any of the stringent requirements necessary to secure an attachment of the assets of 6D Global Technologies, Inc. ("6D Global") under New York law, and its Order to Show Cause and supporting documents seeking provisional relief should therefore be rejected.  Further, Discover has attempted to bring its action against 6D Global in federal court, despite the existence of a valid and binding arbitration clause between the parties that unequivocally requires arbitration of this dispute. Accordingly, Discover's request for attachment should be denied and the Court should grant 6D Global's cross-motion to compel arbitration of this dispute in accordance with the parties' agreement.

On August 10, 2015, pursuant to Discover's form Stock Purchase Agreement ("SPA"), Discover made a $10 million equity investment in 6D Global in exchange for convertible preferred shares in 6D Global.  The SPA contains a broad arbitration clause that requires submission of any and all disputes arising under, related to, or in connection with the SPA to be made before an arbitrator impaneled under the aegis of JAMS International and seated in the Virgin Islands under Cayman Islands law.  Indeed, as set forth in the accompanying Declaration of Mark Szynkowski, Discover included that arbitration clause in the very first draft of the SPA that it sent to 6D Global, and the clause remained unchanged in the final execution version of the SPA.[1]

---

[1]      In addition to providing for arbitration and making Discover a preferred stockholder of 6D Global, the SPA granted Discover significant, highly favorable terms, including, among others:  (i) a favorable dividend rate of 8.5%, (ii) an effective discount of 8% on the shares that Discover purchased, (iii) a substantial dividend jump in the event of any triggering event, and (iv) early conversion provisions allowing Discover to recoup not only any dividends accrued to date but also any dividends that would have accrued in the automatic conversion of outstanding preferred shares to common stock.

Approximately one month after the SPA was signed, on September 8, 2015, 6D Global learned for the first time that an individual named Benjamin Wey—who is not a shareholder, director, or officer of 6D Global and who has no control over the operations of the company— was indicted by the DOJ and, two days later, sued by the SEC for actions alleged to have occurred in connection with various other entities. NASDAQ soon thereafter chose to suspend trading of 6D Global's shares. 6D Global has since diligently endeavored to regain its right to trade under its NASDAQ listing, and continues to operate in the best interests of all its shareholders by maintaining business operations and seeking further growth opportunities to the best of its current ability.

However, rather than permit 6D Global to regain its NASDAQ right to trade and regain its footing, Discover has brought this action and accompanying request for attachment in an effort to effectively shutter the company completely by unwinding the SPA. Despite knowing that it is simply an equity investor in a public company and that it has no right to renege on its investment, Discover now attempts to portray 6D Global as a willing participant in Mr. Wey's alleged schemes. Discover seeks an attachment of 6D Global's assets and other provisional relief in the hopes of simply bullying 6D Global into returning its investment.

Discover does so despite offering no evidence that 6D Global has secreted or disposed of property as required by New York attachment law, let alone done so with intent to defraud its creditors, or to frustrate the enforcement of a judgment, which is unlikely to be rendered against 6D Global in any event. Discover further does so while ignoring the plain terms of the SPA that it drafted, including the all-encompassing arbitration provision calling for dispute resolution in a separate forum.

Accordingly, for the following reasons, this Court should deny Discover's application for an order of attachment and grant 6D Global's cross-motion to compel arbitration of the underlying dispute.  First, Discover is not entitled to prejudgment attachment under CPLR 6201(1) because 6D Global is, in fact, headquartered in New York.  Second, Discover has offered no evidence under CPLR 6201(3) that 6D Global is likely to secret assets out of the state to thwart enforcement of a potential judgment.  Indeed, all that Discover has alleged is that 6D Global is using the proceeds of Discover's investment to fund 6D Global's operations, which is exactly what the parties contemplated in entering into the SPA.  Third, Discover is not likely to succeed on the merits of its claims against 6D Global because Discover has not provided any evidence that 6D Global knew, at the time the SPA was signed, that Mr. Wey was or had been engaged in allegedly fraudulent conduct related to his involvement with other companies.  Fourth, the SPA's broad arbitration clause clearly encompasses this dispute and explicitly requires that any questions of arbitrability be decided by the arbitrator in the first instance.

In sum, Discover has demonstrated nothing more than that 6D Global is using the capital Discover invested to fund 6D Global's own day-to-day business operations, which is precisely what 6D Global is permitted to do with the funds it acquired under the terms of the SPA.  That is simply no ground for attachment under either Article 62 or Article 75 of the CPLR, nor is it ground for the grant of preliminary injunctive relief of any sort.  This includes the continuation of the temporary restraining order currently in place, which should be allowed to expire according to its terms.

## FACTUAL BACKGROUND

**Nature of 6D Global's Business**

6D Global is a digital business solutions company offering marketing and information technology services to a wide range of corporate clients. *See* Declaration of Mark Szynkowski, dated October 2, 2015 ("Szynkowski Decl.") ¶ 4. Specifically, 6D Global works to provide services such as mobile application support and design, web content management and analytics, marketing automation, business intelligence, cloud computing, information technology staffing, and digital marketing and consulting. *See id.* 6D Global's overarching mission is to help business and technology organizations "to create remarkable digital experiences" for their respective clients. *Id.* Ex. 1.

Currently, 6D Global employs approximately 110 persons, including more than 100 full-time employees, who work in various locations across the United States. *Id.* ¶ 5. 6D Global's executive headquarters are located in New York, New York, but the company maintains offices in locations such as California, Ohio, Oregon, and Minnesota as well, with recent plans announced to open an office in Dublin, Ireland. *Id.* ¶ 6.

6D Global's operating subsidiary is Six Dimensions Inc. ("Six Dimensions"). *Id.* ¶ 7. Six Dimensions is also 6D Global's corporate predecessor and was founded in 2004 under the name Initial Koncepts, Inc. by Tejune Kang. *See* Declaration of Tejune Kang, dated October 2, 2015 ("Kang Decl.") ¶ 3. Six Dimensions processes payroll, maintains 6D Global's operating accounts, and conducts 6D Global's general financial operations. Szynkowski Decl. ¶ 7. Six Dimensions is registered to do business with the Secretary of State of New York.[2]

---

[2]    6D Global is not currently registered, but has taken the initial steps to become duly registered by applying to the New York State Department of Taxation and Finance to obtain the necessary consent as a prerequisite to such registration. Szynkowski Decl. ¶ 7.

Currently, 6D Global maintains a broad client base, and has engaged with a number of high profile organizations that maintain a significant online presence. *Id.* ¶¶ 8–15. To illustrate, its top ten clients in terms of revenue are:

1.  STMicroelectronics, Inc. (semiconductor producer, based in Coppell, Texas)

2.  Autodesk, Inc. (supplier of PC software and multimedia tools, based in San Rafael, California)

3.  Citrix Systems, Inc. (provider of virtualization, mobility management, networking, and SaaS solutions to businesses, based in Fort Lauderdale, Florida)

4.  Xilinx, Inc. (supplier of programmable logic devices, based in San Jose, California)

5.  Adobe Systems Inc. (computer software producer, based in San Jose, California)

6.  Randstad USA (human resources and staffing company, based in Atlanta, Georgia)

7.  LinkedIn Corp. (professional networking site operator, based in Mountain View, California)

8.  Crop Production Services Inc. (agricultural product retailer, based in Loveland, Colorado)

9.  Three Point Solutions, Inc. (employment services company, based in Nisswa, Minnesota)

10. Nike, Inc. (athletic footwear, apparel, equipment, and accessory producer, based in Beaverton, Oregon)

*Id.* ¶ 15.

Though 6D Global has only existed in its current form since September 2014, it has secured contracts with well-known organizations such as the Oklahoma City Thunder—a National Basketball Association team—to create an interactive, online version of the team's quarterly fan magazine for use on an array of mobile devices. *Id.* ¶ 12 & Ex. 2. 6D Global has also received market recognition and was selected by the Manhattan Award Program for the 2015 Best of Manhattan Award in the Training Center category. *Id.* ¶ 13 & Ex. 3.

On September 3, 2015, Adobe Systems Inc. ("Adobe") named 6D Global as a Specialized Partner for Adobe Experience Manager.  This recognition demonstrates that 6D Global's work with Adobe met Adobe's strict standards for Adobe Experience Manager Specialization.  *Id.* ¶ 14 & Ex. 4.

**6D Global's Corporate History**

6D Global became a publicly traded company in September of 2014 upon consummation of a merger between Six Dimensions, privately held at the time, and CleanTech Innovations, Inc., a publicly traded company listed on NASDAQ.  Kang Decl. ¶¶ 5, 8.  In 2013, Six Dimensions, in operation under the name Initial Koncepts for nearly a decade, began to explore various merger options with a view toward becoming publicly listed and continuing to expand its operations.  *Id.* ¶ 4.  Six Dimensions, like 6D Global, was an information technology consulting business offering a wide range of solutions to clients of the same ilk as 6D Global's current client base.  *Id.* ¶ 3.

During the course of Six Dimensions' early merger explorations, it sought the advice of Mr. Albert Lee, an acquaintance of Mr. Kang's.  *Id.* ¶ 5.  Mr. Lee subsequently introduced Mr. Kang and Six Dimensions to CleanTech in March of 2014.  *Id.*  Approximately one month later, on April 8, 2014, Mr. Kang and legal representatives for Six Dimensions met with legal counsel for CleanTech and legal counsel for a company called NYGG (Asia) Ltd. ("NYGG Asia").  *Id.* ¶ 6.

CleanTech was an attractive partner for Six Dimensions because CleanTech was a publicly listed company on NASDAQ and because it had evinced a willingness to completely divest its existing wind turbine business such that any resultant business of the merged company would be that of Six Dimensions, only.  Kang Decl. ¶ 5.  Six Dimensions understood that NYGG

Asia was present at the April 2014 meeting because it was a primary creditor of CleanTech and any merger negotiations might therefore involve NYGG Asia as well.  *Id.* ¶ 6.  Benjamin Wey was also in attendance at that meeting.  *Id.*  Six Dimensions and its representatives met Mr. Wey for the first time in March 2014, shortly before the April meeting.  *Id.*

After the introductory April 2014 meeting, Six Dimensions entered into merger discussions with CleanTech.  *Id.* ¶ 7.  Those discussions culminated in a transaction whereby CleanTech ceased all operations and Six Dimensions and CleanTech merged to become 6D Global.  *Id.* ¶ 8.  In light of the debt agreement between NYGG Asia and CleanTech, NYGG Asia became a substantial shareholder in the new 6D Global.  *Id.* ¶ 9.  Any discussions that NYGG Asia, as a 6D Global stockholder, conducted with 6D Global were initiated through Mr. Roger Li, Managing Director and beneficial owner of NYGG Asia.  *Id.* ¶ 9.

**6D Global Begins Expansion Efforts**

After the merger was consummated, 6D Global began trading on NASDAQ.  As a small start-up company, 6D Global knew that it would need to rapidly begin expanding its operations and to that end sought out various funding sources in order to finance ongoing operations and potential future acquisitions.  Szynkowski Decl. ¶¶ 20–23.

In the first quarter of 2015, 6D Global acquired the outstanding membership interest of Topaz Interactive, LLC d/b/a Storycode, a company that creates mobile applications featuring user experience and user interface designs that interact with Adobe systems.  *Id.* ¶ 20 & Ex. 5 at 5.  A few weeks later, 6D Global acquired the outstanding shares of SwellPath, Inc., a professional services firm delivering solutions related to digital marketing, search engine optimization, and analytics.  *Id.*  Both acquisitions were conducted in accordance with 6D Global's mission "to create remarkable digital experiences."  *See id.* ¶ 4 & Ex. 1.

With the understanding that these expansion efforts and acquisitions require significant cash investments, and as stated in its public filings, 6D Global operated at a loss for the first two quarters of 2015. *Id.* ¶ 22 & Ex. 9 at 5. Knowing that 6D Global would require financing, Mr. Kang recalled his meeting with Mr. Wey, who had been introduced to Mr. Kang as a person with a wide network of business contacts. Kang Decl. ¶ 12. Mr. Wey had also been present at the April 2014 meeting and was therefore familiar with 6D Global's business and investment interests. *Id.* ¶¶ 6, 12.

Accordingly, Mr. Kang consulted Mr. Wey for his advice with respect to various potential acquisitions for 6D Global. *Id.* ¶ 13. None of those acquisitions materialized. Further, Mr. Wey was never paid a finder's fee or otherwise compensated for his advice, nor would he have been had an acquisition been consummated. *Id.*

**Discover Invests in 6D Global**

Seeking further growth and financing opportunities, in August of 2015, 6D Global entered into negotiations with Discover to finalize a financing transaction pursuant to which Discover would become a Preferred Stockholder of 6D Global through its equity investment of $10,000,000 in exchange for 1,088 shares of preferred stock at an 8% original issuer discount. *See* Kang Decl. ¶ 14; Szynkowski Decl. ¶¶ 24–25. At the time of the negotiations, 6D Global was told that the transaction would be consummated in accordance with documents that Discover had drafted and the parties therefore did not engage in any substantial negotiation of the terms of the SPA. Kang Decl. ¶ 15; Szynkowski Decl. ¶¶ 25–26.

At the time of the transaction, Discover had full access to information regarding 6D Global's operations, capitalization, officers, and directors through 6D Global's public SEC filings. Szynkowski Decl. ¶ 27. Discover had further access to 6D Global's 10-K filing for the

8

year ending December 31, 2014, which fully disclosed that NYGG Asia held 35,149,883 shares of 6D Global's common stock as a result of the debt conversion agreement related to the CleanTech spin-off.  Szynkowski Decl. ¶ 18 & Ex. 5 at 13.

However, Discover made clear that it did not wish to do any material due diligence on 6D Global's business and did not even want to review 6D Global's current cash flow statements. Kang Decl. ¶ 15; Szynkowski Decl. ¶ 27.  Indeed, despite offering Discover access to material non-public information about 6D Global subject to a standard non-disclosure agreement, Discover rejected that offer and instead made clear that it did not want to receive any non-public information about 6D Global as part of its diligence process leading up to execution of the SPA. *Id.*  In fact, in Section III.A.7 of the SPA, Discover represented that it had not received "any information that constitutes or might constitute material, non-public information." Szynkowski Ex. 11 (SPA).

**Stock Purchase Agreement**

The SPA was signed on August 10, 2015.  Pursuant to its terms, Discover invested $10 million in exchange for 1,088 Preferred Shares of 6D Global, convertible into Common Stock at $5.25 per share.  By way of its equity investment, Discover therefore became (and remains) a preferred shareholder in the newly formed 6D Global, which at the time of closing was a publicly traded company listed on NASDAQ.  The SPA was signed by Tejune Kang and Mark Szynkowski on behalf of 6D Global.  *See id.*

As set forth in further detail *infra*, the SPA is governed by a broad and exclusive arbitration agreement, which provides in relevant part:

> **Arbitration.**  Any dispute, controversy, claim or action of any kind arising out of, relating to, or in connection with this Agreement, *or in any way involving Company and Investor or their respective Affiliates*, including any issues of arbitrability, will be resolved solely by final and

binding arbitration in English before a retired judge at JAMS
International, or its successor, in the Territory of the Virgin Islands . . . .

SPA § VI.H (emphasis added).  The SPA further contains a governing law clause, which

provides as follows:

> **Governing Law.**   All matters between the parties, including without
> limitation questions concerning the construction, validity, enforcement
> and interpretation of the Transaction Documents will be governed by and
> construed and enforced in accordance with the laws of the Cayman
> Islands, without regard to the principles of conflicts of law that would
> require or permit the application of the laws of any other jurisdiction . . . .

SPA § VI.G.

In addition, the SPA included favorable terms that operated to protect Discover's

investment in the transaction.  These include:

A.     Discover's preferred stock carries a favorable dividend rate of
8.5%.  *See* Szynkowski Decl. ¶ 25(a).

B.     The dividend rate jumps to 18.5% upon any "triggering event,"
which would have included 6D Global's failure to get the registration statement
declared effective on an aggressive timetable, as well as any late 1934 Act filing.
*See id.* ¶ 25(b).

C.     The dividend rate on the preferred shares was set to increase by
150 basis points for every $0.25 the volume-weighted average price of the
common stock were to go below $4.25.  It was also set to adjust downward by
100 basis points if the volume-weighted average price were to go above $7.25,
but with a $5.25 conversion price and the difference in adjustments, the ratchet up
is more favorable.  *See id.* ¶ 25(c).

D.     Upon early conversion by Discover or 6D Global, or redemption
by 6D Global, Discover would recover not only all dividends accrued to date but
all dividends that would have accrued by the seven-year automatic conversion of
outstanding preferred shares to shares of common stock.  *See id.* ¶ 25(d).

E.     So long as Discover holds any preferred stock—even one share—
6D Global cannot enter into "any agreement that in any way restricts its ability to
enter into any agreement, amendment or waiver with [Discover]."  *See id.* ¶ 25(e).

**August 18 Meeting**

After consummation of the SPA, Mr. Kang travelled to the Virgin Islands on August 18, 2015 to meet with representatives from Discover. Kang Decl. ¶ 16. Although Mr. Kang first asked Mark Szynkowski and then Jeffrey Meyerson—who had introduced 6D Global to Discover—to accompany him to that meeting, neither was available to do so. *Id.* Mr. Kang therefore thought that Mr. Wey would make a good substitute, in light of Mr. Wey's network of financial contacts and previous interest in providing advice to 6D Global regarding financing. *Id.*

Mr. Kirkland of Discover makes several unsubstantiated allegations regarding statements made at the August 18 meeting. However, as set forth in the Declaration of Tejune Kang, 6D Global's CEO, Mr. Wey did not discuss his alleged "control" of 6D Global. *Id.* In fact, Mr. Wey was not, and never has been, an officer, director, or shareholder of 6D Global. Kang Decl. ¶ 17; Szynkowski Decl. ¶ 29. Further, Mr. Wey did not direct the company's activities in any manner, and he never received payment from 6D Global for any services rendered. Kang Decl. ¶ 17; Szynkowski Decl. ¶ 30.

In any event, in the face of Mr. Wey's alleged statements, Mr. Kirkland did not express concern or surprise at Mr. Wey or his alleged involvement with the company. Kang Decl. ¶ 19. *Id.* Nor did Mr. Kirkland raise any concerns about 6D Global or Mr. Wey after the August 18 meeting until Mr. Wey's indictment. *Id.*

**DOJ and SEC Actions**

On September 8, 2015, nearly one month after the SPA was executed and Mr. Kang traveled to meet with Discover, the U.S. DOJ filed a criminal action against Wey and his banker, Seref Dogan Erbek ("Erbek"), alleging various counts of securities fraud ("DOJ Action").

Declaration of Robert F. Serio, dated September 28, 2015 ("Serio Decl.") Ex. B.  The DOJ allegations relate solely to conduct by Wey and Erbek that occurred between 2007 and 2011.  *Id.* The DOJ Action does not name 6D Global nor does it mention 6D Global in connection with any of the allegations contained within the complaint.  *Id.*  It does not name any directors or officers of 6D Global as defendants.  *Id.*

On September 10, 2015, the SEC filed a civil complaint against Wey, Erbek, and various corporate entities not including 6D Global ("SEC Action").  Serio Decl. Ex. C.  The SEC Action does not name 6D Global as a defendant, nor does it name any directors or officers of 6D Global as defendants.  *Id.*  The SEC Action does not allege any fraudulent conduct with respect to 6D Global, nor does it implicate 6D Global in any of Wey's alleged schemes.  *Id.*  The SEC Action mentions 6D Global only once, at paragraph 46, when it mentions the CleanTech merger that occurred years after the events that concern the SEC.  *Id.*

Prior to the SEC and DOJ Actions, 6D Global was not aware that either the DOJ or the SEC was preparing charges or intended to pursue Mr. Wey for the violations of law of which he has been accused.  Kang Decl. ¶ 21; Szynkowski Decl. ¶ 32.  The first time that 6D Global discovered the allegations against Mr. Wey in connection with the DOJ and SEC complaints was when those complaints were filed in September of 2015, a full month after consummation of the SPA.  *Id.*

**No Dissipation of Assets**

When the SEC and DOJ Actions were filed, 6D Global continued to act in the best interests of its shareholders by maintaining operations conducted in the ordinary course of business.  This has included making payroll, paying rents, making payments to legal counsel in connection with attempts to ensure resumed trading of its stock on NASDAQ, and attempting to explore further growth options for the company.  *See* Szynkowski Decl. ¶ 28.

<u>**ARGUMENT**</u>

I.   **THE SPA'S BROAD, EXCLUSIVE, VALID, AND BINDING ARBITRATION AGREEMENT, WHICH DISCOVER DRAFTED, REQUIRES ARBITRATION OF THIS DISPUTE.[3]**

The SPA expressly states:

> **Arbitration.**   Any dispute, controversy, claim or action of any kind arising out of, relating to, or in connection with this Agreement, *or in any way involving [6D Global] and [Discover] or their respective Affiliates, including any issues of arbitrability, will be resolved solely by final and binding arbitration* in English before a retired judge at JAMS International, or its successor, in the Territory of the Virgin Islands . . . .

*See* SPA §§ VI.G & H (emphasis added).

Although Discover acknowledges the existence of this clause in its attachment papers, it has nevertheless chosen to ignore it and pursue litigation against 6D Global.  *See* ECF No. 10 ("Disc. Mem. of Law") at 23 (setting forth the requirements of the arbitration provision in the SPA).  This is contrary to established law and cannot be permitted.  In light of the broad nature of the parties' arbitration clause and federal policy favoring arbitration, this Court must instead enforce the parties' contractual agreement to arbitrate according to its plain terms.[4]

   A.   **Strong federal policy favors arbitration of the parties' dispute.**

The  SPA's  arbitration  provision  concerns  an  international  commercial  relationship between Discover, a Cayman Islands corporation, and 6D Global, a Delaware corporation, and is

---

[3]   Given the expedited nature of these proceedings, 6D Global respectfully requests that the Court waive its Individual Rule of Practice 4.A.1, which generally requires a pre-motion conference for motions of this type.

[4]   The defendant notes that there may arguably be an issue as to whether this Court has subject matter jurisdiction over the underlying complaint, and does not intend to waive this threshold issue by making its cross-motion for arbitration.  Here, the sole basis for subject matter jurisdiction alleged in the complaint is federal question jurisdiction based on the purported claim under the federal securities laws.  The parties expressly agreed that all matters between them would be governed by the law of the Cayman Islands, "without regard to the principles of conflicts of law that would require or permit the application of laws of any other jurisdiction." SPA § VI.G.

therefore governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, entered into force on June 10, 1958 ("New York Convention").  The United States is a party to the New York Convention, which was implemented through Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201.

It is well established that there is a broad federal policy favoring arbitration.  *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983) ("Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ."); *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution.").  This is particularly so in the context of international transactions.  *See Rep. of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (noting that "'arbitral agreements promote[ ] the smooth flow of international transactions by removing the threats and uncertainty of time-consuming and expensive litigation'").  Accordingly, the burden rests on Discover to prove "that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).  This, Discover cannot do.

### B.    The SPA's arbitration agreement is enforceable under the FAA.

The SPA's arbitration agreement meets the four requirements for enforceability under the FAA:  (1) the SPA is "a written agreement"; (2) the SPA "provide[s] for arbitration in the territory of a signatory of the convention," here the Virgin Islands; (3) the "subject matter [of the SPA]" is "commercial," namely relating to an equity investment in a business venture; and (4) the SPA is not "entirely domestic in scope" because, by definition, it is a contract between an international party (Discover) and a domestic party (6D Global).  *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 92 (2d Cir. 1999).  Accordingly,

the New York Convention and Chapter 2 of the FAA therefore provide jurisdiction to this Court to compel arbitration.  *See* 9 U.S.C. § 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.").

### C.   By its terms, the SPA's arbitration clause requires that any questions of arbitrability must be decided by the arbitrator.

Although Discover contends, in conclusory fashion, that this dispute should proceed in this Court, the SPA's arbitration clause, by its terms, provides that even that determination—and "any [other] issues of arbitrability"—must be decided by the arbitrator.  *Compare* Disc. Mem., at 23, *with* SPA §§ VI.G & H (emphasis added).  It is black letter law that where the parties to an arbitration agreement evince a "clea[r] and unmistakabl[e] intent" to submit the question of arbitrability to the arbitrator, that decision must be respected.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  There is no clearer statement that the parties agreed to submit questions of arbitrability to the arbitrator than the SPA's express statement to that effect.

Moreover, the breadth of the SPA's arbitration clause demonstrates a further intent to submit questions of arbitrability to the arbitrator.  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (ruling that clause requiring arbitration of "any and all controversies" was clear evidence of intent to submit questions of arbitrability to arbitrator); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 575 (S.D.N.Y. 2005) (enforcing arbitration clause that "clearly and unmistakably evidences the parties' intent to submit questions of arbitrability to an arbitrator").

Finally, the SPA's arbitration clause expressly incorporates the arbitration rules of JAMS International, which also state that questions of arbitrability will be decided by the arbitrator. *See* Art. 17 of the JAMS International Arbitration Rules; Rule 8(b) of the JAMS Streamlined

15

Arbitration Rules and Procedures.  Where the parties have adopted an institution's rules that expressly provide that the arbitrator will decide questions of arbitrability, the Court must refer all such questions to arbitration.  *See, e.g.*, *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (relying "specifically on this JAMS rule to conclude that the parties had clearly committed gateway questions of arbitrability to the arbitrator").

### D.     In any event, the SPA's broad arbitration clause covers the underlying disputes between Discover and 6D Global.

Because issues of arbitrability should be decided by the arbitrator, the Court need not address whether the disputes raised by Discover in its complaint are, in fact, subject to the SPA's broad arbitration clause.

If the Court is inclined to do so, however, the SPA's arbitration clause clearly encompasses the present dispute.  The SPA calls for "[a]ny dispute, controversy, claim or action of any kind arising out of relating to, or in connection with this Agreement, *or in any way involving [6D Global] and [Discover]* or their respective Affiliates, including any issues of arbitrability" to be submitted to binding arbitration.  *See* SPA §§ VI.G & H.  Such a broad clause must be enforced according to its plain terms.  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (noting "courts must 'rigorously enforce' arbitration agreements according to their terms") (internal citations omitted); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) ("[W]e have said on numerous occasions that the central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.'").

Here, Discover alleges breaches of the SPA itself, fraud and securities law claims based on omissions and misrepresentations in the SPA, and common law claims, each and every one of which expressly references, and arises out of, Discover's entry into the SPA with 6D Global.

*See* ECF No. 1, ¶¶ 64-116.  Simply put, there is not a single claim that Discover brings against 6D Global in this action that would not be covered by the express terms of the arbitration provision in the SPA.  Indeed, as one of the cases that Discover cites acknowledges, even Discover's securities fraud claims against 6D Global are arbitrable.  *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (cited by Discover at page 23 of its memorandum of law).

> **E.      For the avoidance of doubt, Discover cannot credibly claim that the SPA's arbitration clause was itself induced by fraud.**

In a transparent effort to make an end-run around the SPA's arbitration clause, Discover half-heartedly contends that that clause is unenforceable because both the SPA, and the arbitration clause itself, were procured by fraud and are therefore void and voidable. Disc. Mem., at 23.  This argument fails.

Initially, an attack on the validity of the underlying contract does not negate the validity of the arbitration agreement contained within that contract.  *See, e.g., Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) (stating that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator"). Rather, only if Discover alleges that the SPA's arbitration clause itself was procured by fraud could this Court "intervene" and evaluate the validity of the arbitration agreement and potentially set it aside.  *See, e.g., Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010) ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").  Such a showing is made only in the rarest of cases.  *See* 1 Gary B. Born, *International Commercial Arbitration* 852 (2d ed. 2014) ("[T]he overwhelming majority of cases that address the merits of such claims conclude that there was not sufficient proof of fraud or fraudulent inducement in connection with the arbitration agreement.").

17

Here, Discover unequivocally fails to meet the burden of showing fraud in the inducement of the SPA's arbitration clause. Indeed, Discover's argument is specious given that Discover itself drafted the SPA, including the arbitration clause at issue here, and that clause remained unchanged from the very first draft Discover sent to 6D Global until the SPA was finally signed. *See* Szynkowski Decl., ¶ 26 & Exs. 11-12. Accordingly, Discover cannot credibly contend that it was "fraudulently induced" to agree to an arbitration clause that Discover itself drafted and proposed to 6D Global. *See id.*

For all these reasons, the Court should reject Discover's attempt to avoid the arbitration agreement it proposed and entered into with 6D Global, and should instead force Discover to abide by the bargain it made—to arbitrate its disputes with 6D Global pursuant to the SPA's broad arbitration clause.[5]

## II.   DISCOVER IS NOT ENTITLED TO AN ATTACHMENT OF ANY OF 6D GLOBAL'S ASSETS.

The law is clear that attachment "is a harsh remedy" and that any request for an attachment "should be construed strictly against those seeking to use it." *Sea Trade Co. v. FleetBoston Fin. Corp.*, 2008 WL 161239, at *3 (S.D.N.Y. Jan. 15, 2008) (quotations omitted). Moreover, even if the technical requirements for attachment are met, this Court has the discretionary power to deny the provisional remedy. *See Elliott Associates*, *L.P. v. Republic of Peru*, 948 F. Supp. 1203, 1211 (S.D.N.Y. 1996) ("The granting of prejudgment attachments

---

[5]   Although Discover also argues that its claims against 6D Global must proceed in litigation on efficiency grounds, because Discover has elected to pursue claims against defendants who may not be bound by the arbitration agreement, that is not sufficient to defeat the SPA's broad arbitration agreement that clearly encompasses the claims Discover advances against 6D Global.

In the event this Court grants 6D Global's motion to compel arbitration, 6D Global requests that the Court stay proceedings, rather than dismiss the action, pursuant to the Second Circuit's recent holding in *Katz v. Cellco P'ship*, --- F.3d ---, 2015 WL 4528658 (2d Cir. July 28, 2015).

pursuant to CPLR §§ 6201 and 6212 is discretionary with the district courts, and even when the statutory requisites are met, the order may be denied.") (quotations omitted).

Here, Discover seeks the provisional remedy of attachment pursuant to CPLR 6201 & 6212 or, in the alternative, presumably under CPLR 7502(c). Discover does not come close to meeting the high bar required by either standard. Further, even if Discover could meet the CPLR's requirements (and it cannot), the Court should nevertheless deny Discover's request.

### A.    Standard for granting attachment

An applicant for prejudgment attachment must "show, by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR 6212(a). These statutory factors must be "strictly construed in favor of those against whom attachment is sought." *DLJ Mortgage Capital*, *Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) (quotation omitted).

Section 6201 enumerates five grounds for attachment, two of which are invoked by Discover in its papers:  (i) CPLR 6201(1), by which an attachment may issue if the defendant "is a foreign corporation not qualified to do business in the state"; and (ii) CPLR 6201(3), by which an attachment may issue if the defendant "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." *See* Disc. Mem., at 20-22 (citing CPLR 6201(1), 6201(3)).

Here, Discover fails to meet the requirements of either subsection of CPLR 6201, and has further failed to present any facts sufficient to establish a probability of success on the merits. Discover's request for an attachment should therefore be denied.[6]

### B.   Discover fails to prove any security risk justifying an attachment under CPLR 6201(1).

Initially, Discover argues, with no substantive analysis, that an attachment in this case is proper based solely on the fact that 6D Global has not yet registered to do business in New York with the office of the Secretary of State.  *See* Disc. Mem., at 21.  This is simply incorrect.

CPLR 6201(1) serves "two independent purposes: obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state." *Etalon Imob S.R.L. v. Schoenbach*, 2012 WL 4741595, at *4 (S.D.N.Y. Oct. 3, 2012) (quotations omitted).  Where jurisdiction over a defendant exists and "the only purpose for a pre-judgment attachment is security, a different analysis should apply than that used for jurisdictional attachments."  *Id.* Specifically, where the Court plainly has jurisdiction over a party, then an application for attachment under CPLR 6201(1) requires "an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk to the enforceability of a future judgment."  *Id.*  Discover is therefore wrong that 6D Global's nondomiciliary status alone entitles Discover to attach 6D Global's assets here.

6D Global does not contest that it is subject to the personal jurisdiction of this Court—in fact, Discover alleges (correctly) in its Complaint that 6D Global has its principal place of

---

[6]    If Discover were to petition for attachment in aid of arbitration under CPLR § 7502(c), it would still not satisfy the necessary burden of proof.  Under Article 75, a petitioner must satisfy the same standards enumerated in CPLR § 6212— which Discover cannot do—except that the sole ground for granting an attachment would be that an arbitration award "may be rendered ineffectual without such provisional relief." See Swift Splash Ltd. v. Rice Corp., 2010 WL 3767131, at *2 (S.D.N.Y. Sept. 27, 2010).  Discover can make no such showing because it has not produced any facts showing that 6D Global is likely to dispose of assets such that a future arbitration award would be meaningless.

business in New York.[7]   *See* ECF No. 1, ¶ 8.   Accordingly, Discover cannot satisfy CPLR 6201(1) without showing that 6D Global's "financial position or past and present conduct, poses a real risk to the enforceability of a future judgment."   *Etalon Imob S.R.L.*, 2012 WL 4741595, at *4 (quotations omitted).   Here, Discover only contends that 6D Global is spending the proceeds of Discover's investment through the SPA "to fund operations."   Disc. Mem., at 13. Given that that is exactly what Discover invested the money for—to allow 6D Global to run its business and pursue acquisitions—Discover fails to make a prima facie showing under CPLR 6201(1).

### C.   Discover has failed to demonstrate that 6D Global is secreting any assets out of New York as required by CPLR 6201(3).

Discover similarly fails to meet the high bar for attachment under CPLR 6201(3).   Under that provision, Discover must prove "both that the defendant (1) has assigned, disposed of, encumbered, or secreted property, or removed it from the state, or is about to do any of these acts; and (2) has acted or will act with the intent to defraud creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor."   *Silverman v. Miranda*, 2015 WL 4486296, at *15 (S.D.N.Y. July 22, 2015) (internal quotations omitted).   Discover cannot even satisfy the first prong of this test, let alone the second.

In an attempt to demonstrate that 6D Global has secreted property, Discover essentially reiterates the allegations against Benjamin Wey contained in the DOJ indictment and SEC complaint.   *See* Disc. Mem., at 21-22.   To that end, Discover alleges that Mr. Wey fraudulently transferred assets of other companies in the years following 2007.   But 6D Global had no

---

[7]   Further, Six Dimensions Inc., 6D Global's operating subsidiary, is registered to do business in New York, and 6D Global is currently in the process of becoming registered.   *See* Szynkowski Decl. ¶ 7.

relationship with Mr. Wey until 2014, so regardless of whether or not the allegations against him are true, they are irrelevant to Discover's application. *See* Kang Decl. ¶ 6. Indeed, despite its sensational contentions, Discover has presented no *evidence* that Mr. Wey somehow "controlled" 6D Global or dictated 6D Global's operations. In the absence of such a showing—or some other showing that Mr. Wey and 6D Global were in fact one and the same—Mr. Wey's conduct should not be imputed to 6D Global for the purposes of securing the harsh provisional remedy of attachment against 6D Global's assets.

In fact, the only evidence that Discover puts forth is that 6D Global advised Discover that the proceeds of Discover's investment were being used to fund the company's ordinary operating expenses. But this is clearly not the fraudulent "dissipation" of assets with which CPLR 6201(3) is concerned. Indeed, by Discover's rationale, every investor in a target company would be entitled to attach the target company's assets if the company is using the investment to fund its operations and the investor and the target subsequently get into a dispute. That is simply not the law.

In sum, Discover has not alleged, much less proven, that 6D Global has secreted or dissipated any of its assets as contemplated by CPLR 6201(3), much less that 6D Global has done so with intent to defraud its creditors—and Discover is not a creditor in any event—or to frustrate the enforcement of a judgment. Discover's request for an attachment therefore fails.

**D.     Discover is not likely to succeed on the merits of either its breach of contract or its securities fraud claims, nor any of its other common law claims.**

Initially, Discover reverses the burden of proof, wrongly contending that the burden is on 6D Global to demonstrate that "the plaintiff's cause of action must ultimately fail"; instead Discover "must make an evidentiary showing of proof stronger than that required to establish a prima facie case" in order to show that Discover has a likelihood of success on the merits. *DLJ*

*Mortg. Cap., Inc.*, 594 F. Supp. 2d at 319 (quotation omitted).  This is simply not the law.  *See* Disc. Mem., at 15.[8]

Here, Discover offers a number of sensational allegations about Mr. Wey's "control" of 6D Global and use of the company for fraudulent purposes.  6D Global disputes these allegations, which in any event involve credibility determinations that cannot be resolved on an emergency basis on a motion for provisional remedy.  Moreover, Discover has not established a probability of success on the merits of its claims as follows.

*First*, Discover's allegation that 6D Global is using the capital invested by Discover, in part, to fund ongoing ordinary business expenses fails to state a claim for breach of the SPA, let alone establish a likelihood of success on the merits of that claim.  The SPA contains no restriction on 6D Global's use of the proceeds of Discover's investment, and even under Discover's allegations, 6D Global's use of those proceeds is entirely consistent with the purposes of the SPA—to fund the company's continued growth.  *See* Szynkowski Decl. ¶ 24 & Ex. 8.  In sum, all that 6D Global has done with the money is use it for continuing operations, as any good company should do (and as any shareholder like Discover would presumably want the company to do).  If Discover wishes for 6D Global to use the funds specifically to pay for acquisitions, then surely Discover should recognize that an attachment of 6D Global's funds would thwart the company's ability to do so.

*Second*, Discover's allegations of securities fraud fare no better.  While Discover relies heavily on the SEC's complaint and DOJ's indictment against Mr. Wey, none of the allegations in either of those filings relates to 6D Global's actions.  *See* Serio Decl. Exs. B-C.  Instead, they

---

[8]    Discover wrongly provides the standard required for a defendant to modify or vacate an existing attachment, which is governed by CPLR 6223.  To that end, Discover improperly cites *Marklin v. Drew Props. Corp.*, 280 F. Supp. 176 (S.D.N.Y. 1967), a CPLR 6223 case.

predominantly relate to Mr. Wey's alleged conduct as early as 2007, years before he first met any representatives of 6D Global. *Compare* Serio Decl. Exs. B-C, *with* Kang Decl. ¶ 6. Further, Discover's securities fraud allegations fail because Discover posits no evidence that 6D Global knew, at the time that the SPA was signed in August 2015, about the allegations subsequently disclosed by the DOJ or the SEC in September 2015. Simply put, Discover's unsubstantiated allegation that 6D Global made statements during the negotiation of the SPA that it knew to be false at the time is not sufficient to establish a likelihood of success on the merits, particularly when 6D Global has now come forth with evidence refuting those allegations. *See* Kang Decl. ¶ 21; Szynkowski Decl. ¶ 32.

*Third*, Discover also casually lists, in its memorandum of law, a number of other claims—including common law fraud, conspiracy, negligent misrepresentation, rescission, and constructive trust—that it has asserted against 6D Global and the other defendants, but it does not even attempt to explain why it is likely to succeed in proving any of them. *See* Disc. Mem., at 20. Simply listing claims does not establish Discover's likelihood of success in proving them. Discover has failed to make any showing at all as to these claims.

For all these reasons, Discover has failed to establish a likelihood of success on the merits as required under CPLR 6201 and the Federal Rules of Civil Procedure.

### E.    6D Global reserves its right to assert counterclaims against Discover in a future arbitration.

As set forth in Mr. Kang's Declaration, 6D Global reserves the right to assert certain counterclaims against Discover in a future arbitration. *See* Kang Decl. ¶ 23. For this reason, too, Discover cannot meet its burden under CPLR 6201.

*          *          *          *

For all these reasons and the additional reasons set forth above, Discover has not established a likelihood of success on the merits sufficient to justify any provisional remedy under New York law, or any other provisional relief under the Federal Rules of Civil Procedure. Accordingly, Discover's request for an attachment should be denied, the temporary restraining order against 6D Global should be lifted, and Discover and 6D Global should be compelled to arbitrate their disputes in their chosen arbitral forum pursuant to the SPA's broad arbitration clause.

## CONCLUSION

For the foregoing reasons, the Court should: (i) deny Discover's application for an order of attachment or any other provisional remedy or relief; (ii) lift the temporary restraining currently in place against 6D Global; and (iii) grant 6D Global's cross-motion to stay proceedings and compel arbitration according to the clear terms of the parties' SPA.

Dated: New York, New York          K&L GATES LLP
       October 2, 2015


                                   By: _David S. Versfelt_
                                       David S. Versfelt
                                       Brian D. Koosed
                                       Anthony P. Badaracco
                                   599 Lexington Avenue
                                   New York, New York 10022-6030
                                   Tel: (212) 536-3900
                                   Fax: (212) 536-3901
                                   david.versfelt@klgates.com
                                   brian.koosed@klgates.com
                                   anthony.badaracco@klgates.com

                                   *Attorneys for Defendant 6D Global Technologies Inc.*