# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Robert F. Serio
Direct: +1 212.351.3917
Fax: +1 212.351.5246
RSerio@gibsondunn.com

October 28, 2015

VIA FACSIMILE AND ECF

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   Discover Growth Fund v. 6D Global Technologies Inc., et al. No. 15-cv-07618

Dear Judge Castel:

We represent Discover Growth Fund ("Discover"), Plaintiff in the above captioned action. Following Your Honor's Order yesterday permitting Defendant 6D Global Technologies Inc. ("6D") to make yet another payroll, approximately half of Discover's $10 million is now gone after only a month. In short order there will be nothing left. 6D has not provided complete or current information about how much revenue it has actually received, what its cash flows are, or how much money the "business" is losing on a monthly, weekly or daily basis. That 6D is continuing to spend at an alarming rate makes clear that granting an attachment is the only way to secure any future judgment that Discover may win in this case.

Discover was defrauded by Benjamin Wei, who is the majority shareholder of 6D through NYGG and his wife – with whom he manipulated the stock price of 6D to fraudulently induce innocent investors such as Discover to buy its stock. The inferences from the Weis' taking the Fifth in the SEC investigation, all which must be taken in favor of Discover for purposes of an attachment motion, are sufficient alone to warrant attachment. *See St. Owner, L.P. v. Novog*, 31 Misc. 3d 680, 693, 921 N.Y.S.2d 814, 823 (Civ. Ct. 2011), citing *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983) ("Refusal to answer questions upon asserting the Fifth Amendment privilege is relevant evidence from which the trier of fact in a civil action may draw whatever inference is reasonable under the circumstances."). But, that is far from the only evidence that demonstrates Wei's manipulation. The CEO and remaining board member of 6D Global, Tejune Kang, inexplicably obtained a six figure "loan" from the wife of the man he claims to have no relationship with, Benjamin Wei, and then used the proceeds to buy 6D stock, thereby continuing the very market manipulation scheme for which Wei was indicted.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Hong Kong • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

Discover has further demonstrated a likelihood of success on its breach of contract claims and is entitled to an attachment under CPLR 7502(c). In its October 21, 2015 letter, 6D puts forth an erroneous interpretation of the "Closing Conditions" provisions in § II.C.6, the express purpose of which was to ensure that nothing existed *as of closing* that "may" later create problems for Discover. Criminal and SEC investigations that existed as of closing, and shortly thereafter did lead to a trading halt, loss of strategic acquisitions (Kirkland Decl. ¶ 4), resignation of independent directors, and shareholder litigation, all unquestionably the very kinds of things the closing conditions were designed to protect Discover against. That Discover did not discover the investigations until later does not mean they did not exist as of closing, as they unquestionably did, or that they did not constitute a breach of the closing conditions as of the closing date, as they unquestionably did.

There is no dispute that the SEC and DOJ investigations were pending (if not completed) at the time of closing. Nor could there be any doubt that the existence of those investigations could reasonably be seen, at the time of execution, to potentially adversely affect future transactions contemplated by the SPA, including the conversion and selling of Conversion Shares. The SPA contemplates such transactions by recognizing the need to maintain full compliance with its Trading Market's listing requirements into the "foreseeable future." § III.B.17.[1]

Even if 6D Global were correct (it is not) in its narrow interpretation of the SPA's "Closing Conditions," 6D Global has nevertheless also breached non-closing representations and warranties. 6D unquestionably breached the warranty that: "There is no adverse material information regarding Company that has not been publicly disclosed prior to the Effective Date." § III.A.7. There is no company knowledge qualifier. *Id.* The SEC and DOJ investigations were not publicly disclosed (though Wei and his wife certainly knew about them), and constituted adverse material information. If Discover had known about an investigation into manipulation of 6D's stock, it never would have bought it.

---

[1] 6D's reliance on *dicta* in the unpublished opinion issued in *IMO Indus., Inc. v. Sierra Int'l, Inc.*, No. CIV. A. 18783, 2001 WL 1192201, at *1 (Del. Ch. Oct. 1, 2001) is misplaced. That case involved application of an arbitration clause, which has no bearing on the fraud and breach of contract claims at issue here. Moreover, the contract at issue in *IMO* involved transactions that were "not consummated" as of closing and addressed whether the buyer should be required "to consummate" them, (*Id.*), which is substantially different language than the SPA clause here which says nothing about consummation. The *IMO* court rejected the contention that the arbitration clause should not apply because the entire deal "was not consummated because the final transaction, payment of the post-closing adjustment, was never completed" and instead applied the terms of the agreement including the arbitration clause. *Id.* at *2-3. That result is fully consistent with what Discover seeks here.

**GIBSON DUNN**

6D further breached the warranty that "[t]here is no . . . proceeding or investigation pending . . . which would reasonably be expected to adversely affect ... any of the Transaction Documents or the issuance of any Shares hereunder." § III.A.4.

6D also breached the warranty that "there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect." § III.B.4. The DOJ and SEC investigations would reasonably be expected to result in exactly what they, in fact, did result in – trading halt, loss of strategic acquisitions, board resignations, shareholder litigation, and more adverse effects likely to keep coming.[2]

Based on the record before this Court, Discover has sufficiently demonstrated that the pending (if not concluded) investigations would reasonably be expected to adversely impact the benefit of Discover's bargain. The government investigations and actions have led to substantial "material adverse effects" on 6D in the form of halted trading in its stock, and also the cancellation of planned strategic acquisitions, which were to be acquired half with Discover's money and half with the stock which has been halted (Kirkland Decl., ¶4), the resignation of three independent directors from the board (which the company knew about at the time of the attachment hearing but failed to disclose to Discover or the Court), and class

---

[2] 6D also miscites *In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 67 (Del. Ch. 2001), which held only that a "short-term blip" in earnings would not be material to an acquiror who seeks to purchase the company as part of a long-term strategy, "so long as the target's earnings-generating potential is not materially affected by that blip or the blip's cause." *Id.* at 67. "To such an acquiror, the important thing is whether the company has suffered a Material Adverse Effect in its business or results of operations that is consequential to the company's earnings power over a commercially reasonable period." *Id.* "A short-term hiccup in earnings should not suffice; rather the Material Adverse Effect should be material when viewed from the longer-term perspective of a reasonable acquiror." *Id.* at 68. Discover was acquiring Conversion Shares to resell on NASDAQ, and an investigation that may lead to a trading halt was unquestionably important to it.

Moreover, as explained by the court in *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, No. CIV.A. 8980-VCG, 2014 WL 5654305, at *18 (Del. Ch. Oct. 31, 2014), in *IBP* the court found that the defendant's restatement of its financials did not breach the material adverse effect clause, because its disclosure schedules "expressly disclosed that the seller may be subject to further liabilities associated with improper accounting practices," and the buyer "admitted that it made no economic difference" whether financials were restated or simply recorded in a later period." *Id.* The court therefore rejected plaintiff's arguments as "hair-splitting" with "no rational commercial purpose." *Id.* A criminal investigation of the controlling shareholder for manipulating the very stock being purchased is hardly "hair-splitting."

**GIBSON DUNN**

action litigation, all of which have materially injured the company and turned 6D's stream of revenue into a trickle.

Discover need not demonstrate a right to rescind the contract (though it has) in order to attain an attachment to the full extent of its original investment. The damages that flow from 6D's breach of the SPA – Discover's likely loss of its full investment – entitle Discover to an attachment in support of monetary damages of $10 million, the amount of Discover's investment.

For all of these reasons, we urge the Court to grant Discover's application for an attachment as soon as possible.

Respectfully,


/s Robert F. Serio
Robert F. Serio

cc: Tom M. Fini (by ECF)
cc: David S. Versfeldt (by ECF)