UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DISCOVER GROWTH FUND,

                        Plaintiff,                    15-cv-7618 (PKC)

        -against-                                     MEMORANDUM
                                                     AND ORDER

6D GLOBAL TECHNOLOGIES INC.; NEW
YORK GLOBAL GROUP, INC.; NYGG (ASIA),
LTD.; BENJAMIN TIANBING WEI A/K/A
BENJAMIN WEY; TEJUNE KANG; MARK
SYNKOWSKI; ADAM HARTUNG; DAVID S.
KAUFMAN; TERRY MCEWEN; ANUBHAV
SAXENA; TIANYI WEI; MICHAELA WEI;
SEREF DOGAN ERBEK,

                        Defendant.
----------------------------------------------------------x

CASTEL, U.S.D.J.

             Plaintiff Discover Growth Fund ("Discover") seeks an order attaching $10 million

in the possession of 6D Global Technologies Inc. ("6D").  In its complaint, Discover alleges,

among other things, that 6D and others violated sections 10(b) and 29(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78(j); 78cc, and breached certain

representations, warranties, and closing conditions in a Stock Purchase Agreement ("SPA").

Specifically, Discover alleges that 6D failed to disclose the existence of investigations by a

federal grand jury and the Securities and Exchange Commission ("SEC") into Benjamin Wei,

also known as Benjamin Wey, relating to a corporate predecessor of 6D, CleanTech Innovations,

Inc. ("CleanTech").  6D vigorously denies any knowledge at the time of closing of the SPA of

the grand jury and SEC investigations and asserts that it was a target of neither.  Wei is a

defendant in this action and is alleged to be a principal shareholder of defendant New York

Global Group ("NYGG") and its alleged affiliate New York Global Group Asia LTD ("NYGG-Asia").  NYGG-Asia is alleged to own somewhere in excess of 45% of the shares of 6D.

Discover and 6D entered into the SPA on August 10, 2015.  On August 13, 2015, 6D confirmed receipt of Discover's $10 million payment.  A grand jury indictment of Wei was unsealed on September 10, 2015.  United States v. Wei, et al., 15 cr 611 (AJN).  Also, Wei, NYGG, and others were named as defendants in an SEC enforcement action filed September 10, 2015.  SEC v. Wey, 15 cv 7116 (PKC).  Two days later, NASDAQ suspended trading in the common stock of 6D.  Neither the indictment nor the SEC enforcement action charged 6D or its predecessor.

As noted, Discover now seeks an order of attachment directed to $10 million in the possession of 6D.  Pending the hearing and determination of the motion, the Court granted and alter modified a temporary restraining order, set a bond in the amount of $50,000, and set the matter down for a hearing on the requested attachment. Discover does not seek any provisional remedies against Wei, NYGG, or NYGG-Asia.

Prior to the October 5, 2015 hearing, neither side sought expedited discovery of the other.  At the hearing, the Court gave Discover and 6D the opportunity to present evidence.  Neither side called live witnesses; both sides rested on their declarations and documentary evidence.  This Memorandum and Order sets forth the Court's finding of facts and conclusions of law.

At this early stage and without the benefit of discovery, Discover has not proven a likelihood of success on the merits against 6D and, accordingly, the application for attachment will be denied.

JURISDICTION

Unquestionably, the Court has federal question jurisdiction over Discover's claims of alleged violations of the Exchange Act.  28 U.S.C. §1331.  The Court has supplemental jurisdiction over Discover's remaining common law claims, including its breach of contract claim, because they derive from the same "case or controversy" involving the parties' SPA.  28 U.S.C. §1367.  Although not alleged as a basis for subject matter jurisdiction, it appears that there is also diversity jurisdiction.  28 U.S.C. 1332.  Discover is a Cayman Islands corporation with its principal place of business in the Cayman Islands and 6D Global is a Delaware Corporation with its principal place of business in New York.  (Compl. ¶¶7-8).  No other defendant is domiciled in the Cayman Islands.  (See Compl. ¶¶9-20).  The amount in controversy is at least $10 million.  (See Compl. ¶5).

BACKGROUND

Discover is a mutual fund registered in the Cayman Islands.  (Compl. ¶7).  6D is a digital business solutions company that provides marketing and technology services to other businesses.  (Szynkowski Decl. ¶4).  It is a Delaware corporation headquartered in New York, New York and its shares have traded on NASDAQ under the symbol "SIXD."[1]  (Compl. ¶8).

On August 10, 2015, Discover and 6D entered into the SPA whereby Discover paid 6D $10 million in exchange for 1,088 shares of Series A Redeemable Convertible Preferred Stock at an 8% original discount.  (Compl. Ex A, p.1-2).  On August 13, 2015, 6D confirmed receipt of Discover's $10 million payment.  (Kirkland Decl. ¶1).  Those preferred shares are convertible into common stock at $5.25 per share.  (Compl. Ex A, p.1-2).  Discover elected not to obtain confidential due diligence materials from 6D and, indeed, demanded that neither 6D

---

[1] 6D is not registered to conduct business in New York, a point of potential significance under New York's attachment statute, CPLR §6201.  (Szynkowski Decl. ¶7).

nor any affiliated person or entity provide Discover with any material non-public information of any kind related to 6D.  (Compl. Ex. A, IV.F; Meyerson Decl. ¶3).  The acquisition of material non-public information of 6D may have inhibited Discover's ability to trade in the securities of 6D.

Benjamin Wei is the founder and President of NYGG, a company that offers consulting and other services to China-based operating companies that wish to raise funds in the United States capital markets.  (Serio Decl. 2, Ex. P, p.10).  On September 8, 2015, a grand jury sitting in this District indicted Wei for crimes including securities fraud, wire fraud, and stock manipulation.  (Compl. Ex. B).  On September 10, 2015, the indictment was unsealed and the SEC filed an enforcement action against Wei for various violations of the Exchange Act. (Compl. Ex. C).  Both the criminal and enforcement actions derive, in part, from Wei's allegedly fraudulent activities in relation to the purchase or sale of CleanTech securities.  (See Compl. Ex. B ¶¶18-20; Ex. C ¶¶63-64, 81).  No claim is made in the indictment or enforcement action that CleanTech was an active participant in any fraud.

CleanTech is, as defense counsel conceded at the October 5 hearing, a predecessor company to 6D.  (See Serio Decl. 2, Ex. H; Transcript from Hearing on Motion for Order of Attachment, October 5, 2015 ("Tr., Oct. 5, 2015"), p.37-39).  In September 2014, CleanTech and a company called Six Dimensions merged to become 6D.[2]  (See Serio Decl. 2, Ex. H; Tr., Oct. 5, 2015, p.37-39).  It was through the terms of that merger that NYGG-Asia, an affiliate of NYGG and a large creditor of CleanTech's, became a 45% shareholder in 6D.  (See Serio Decl. 2, Ex. H; Ex. P, p.9-10).  CleanTech's 14C filing, which describes the transaction

---

[2] 6D's latest 10-K categorized the transaction between CleanTech and Six Dimensions as a "reverse recapitalization."  (Szynkowski Decl., Ex. 5, p.57).

between CleanTech and Six Dimensions, noted Wei's presence at an April 8, 2014 meeting of the two companies.  (Serio Decl. 2, Ex. H, p.12).

Discover was aware that NYGG-Asia was the largest single shareholder of 6D prior to entering the SPA, (See Serio Decl., Ex. D, p.3), but claims to have never heard of Wei before meeting him on August 18, 2015, i.e. after the closing, (Kirkland Decl. ¶2).   The fact that NYGG-Asia controlled 45% of 6D's shares was documented in 6D's most recent 10-K filed with the SEC on March 19, 2015.  (Szynkowski Decl., Ex. 5, p.23).  Discover does not claim that, prior to entering into the SPA, it asked any questions of 6D as to the identity of the principals or shareholders of the entity holding 45% of the shares of 6D, in which it was making a $10 million investment.  Discover now claims that NYGG-Asia is controlled by NYGG and Wei and that Wei is the *de facto* 45% shareholder of 6D.  (See Serio Decl. 2, Ex. K; Meyerson Decl. ¶4; Tr., Oct. 5, 2015, p.24).  6D admits that Wei has acted as an occasional uncompensated consultant for the company.  (Szynkowski Decl. ¶30).  Tejune Kang, the CEO of 6D, told Discover in an email that he would bring "a representative from NYGG Asia" to meet Discover in the Cayman Islands on August 18, 2015.  (Kirkland Decl. 2, Ex. A).  Kang brought Wei to that meeting. (Kirkland Decl. ¶2).

On September 12, 2015, approximately one month after the parties executed the SPA and two days after the indictment of Wei was unsealed and the SEC filed its enforcement action, NASDAQ suspended trading of 6D's common shares.  (Serio Decl. 2, Ex. N).  On September 28, 2015, Discover brought this action.  (Compl.)  Discover now seeks an attachment

in aid of an arbitration that it stated it intends to initiate within 30 days of any Order from this Court ruling on the application for attachment.[3]  (Tr., Oct. 5, 2015, p.27).

DISCUSSION

   A.  Legal Standard for an Attachment in Aid of Arbitration

        Rule 64, Fed. R. Civ. P., provides that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."   An attachment is one of those remedies.  Rule 64(b).  Discover's motion for attachment is governed by New York law, the law of the forum.  See Rule 64.

        There are two parallel paths to obtaining the provisional remedy of attachment under New York law.  One is Article 62 of the Civil Practice Law and Rules ("CPLR"), setting forth the grounds for attachment, and the other is Article 75 of the CPLR, the catch-all section for provisional remedies in aid of arbitration.  Discover has announced its intention to timely commence an arbitration in the Virgin Islands against 6D and, indeed, 6D has asserted that the claims against it can only be brought in arbitration.  (See Defendant's Memorandum of Law in Opposition, p.13-18).  Discover has made it plain that it is seeking the attachment in aid of arbitration.  (Tr., Oct. 5, 2015, p.27).

        To obtain a provisional remedy in aid of arbitration, whether a preliminary injunction or attachment, the applicant must demonstrate that "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."  N.Y. CPLR

---

[3] The SPA contains a broad arbitration clause: "[a]ny dispute, controversy, claim or action of any kind arising out of, relating to, or in connection with this Agreement, or in any way involving Company and Investor or their respective Affiliates, including any issues of arbitrability, will be resolved solely by final and binding arbitration . . . ." (Compl. Ex. A, VI.H).

§7502(c).[4]  The express language of section 7502(c), suggests that an applicant who satisfies the "rendered ineffectual" standard need not satisfy the other statutory grounds for attachment, except those relating to undertakings and the timely commencement of an action.  However, the Second Circuit has found the language of section 7502(c) less than clear and held that an applicant for a preliminary injunction must also satisfy New York's preliminary injunction standards under Article 63.  SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 82-83 (2d Cir. 2000); see also Erber v. Catalyst Trading, LLC., 303 A.D.2d 165 (1st Dep't 2003).

        The logic of Messih applies with equal force to an application for an attachment under section 7502(c).  This means that Discover is required to satisfy the requirements of section 6212(a), which provides that "[o]n a motion for an order of attachment, or for an order to confirm an order of attachment, the plaintiff shall show, by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits . . . and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  N.Y. CPLR §6212(a); see Shah v. Commercial Bank Ob'Edinennyi Investitsionnyi Bank, 09 cv 6121(HB), 2010 WL 743043, at *2 (S.D.N.Y. Mar. 4, 2010).  Indeed, both sides, in their briefing and argument, acknowledged the requirement of establishing a probability of success on the merits.

        As long as an applicant satisfies section 7502(c)'s "rendered ineffectual" requirement and also section 6212(a)'s probability of success and exceeds all known counterclaims requirements, it need not also establish one of the statutory grounds set forth in

---

[4]Prior to 2005, provisional remedies in aid of foreign arbitrations were not available under CPLR 7502(c).  See ContiChem LPG v. Parsons Shipping Co., Ltd., 229 F.3d 426, 430-33 (2d Cir. 2000).  A 2005 amendment to CPLR §7502(c) expanded its reach to include arbitrations "inside or outside this state, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards. . . ."  See Sojitz Corp. v. Prithvi Information Solutions Ltd., 82 A.D.3d 89, 92-93 (1st Dep't 2011).

section 6201 (e.g. foreign corporation not qualified to do business in the state, intent to defraud).[5]  See Mishcon de Reya New York LLP v. Grail Semiconductor, Inc., 11 cv 04971 (RJH) 2011 WL 6957595, at *8 (S.D.N.Y. Dec. 28, 2011); see also Sivault Sys., Inc. v. Wondernet, Ltd., 05 cv 0890 (RWS), 2005 WL 681457, at *3 n.1 (S.D.N.Y. Mar. 25, 2005) ("The grounds for attachment set forth in Section 6201 are, by the express terms of Section 7205(c), inapplicable to petitions for orders of attachment brought pursuant to that latter section.").  But see Erber, 303 A.D.2d at 165 (1st Dept. 2003) ("[T]he criteria for provisional relief set forth in CPLR articles 62 and 63 are not relaxed when such relief is sought in aid of arbitration pursuant to CPLR 7502(c).").

The grant of an attachment is discretionary to the extent a court must weigh evidence and balance competing considerations.  Capital Ventures Intern. v. Republic of Argentina, 443 F.3d 214, 222 (2d Cir. 2006).  However, where "a statutory ground for attachment exists and both need and likelihood of success are established, its discretion does not permit denial of the remedy . . . absent extraordinary circumstances and perhaps even then." Id. The party seeking an attachment still "bears a heavy burden . . . because New York attachment statutes are construed strictly against those who seek to invoke the remedy."  Mishcon, 2011 WL 6957595, at *3 (quoting Nat'l Audobon Soc'y, Inc. v. Sonopia Corp., 09 cv 975, 2009 WL 636952, at *2 (S.D.N.Y. Mar. 6, 2009)).

B.  Application

Discover has not carried its burden under section 7502(c) for an attachment in aid of arbitration because it has not established a likelihood of success on the merits of any of its

---

[5] There is no serious dispute that Discover could satisfy the grounds set forth in CPLR 6201(1) in that 6D is a foreign corporation—it is a corporation organized under the laws of Delaware—and is not qualified to do business in New York.  (Szynkowski Decl. Ex. 5, p.1; Szynkowski Decl. ¶7).

claims.  Discover asserts twelve claims against 6D including breach of certain representations, warranties, and closing conditions in the SPA, violations of sections 10(b) and 29(b) of the Exchange Act, and various other fraud, contract, and negligence based claims.  At the October 5 hearing, Discover focused almost exclusively on the arguments supporting its breach of contract claim.  Discover also addressed the section 10(b) claim in its memoranda of law, which were submitted prior to the October 5 hearing.  On the motion, Discover has advanced no argument as to why it is likely to succeed on the merits of any of the other ten claims.  Because Discover bears the burden of establishing a probability of success on the merits, the lack of any rationale supporting its ten remaining claims would be fatal to any attempt to seek an attachment on those grounds.

To establish "probability of success on the merits," Discover must demonstrate that it more likely than not will succeed on any one of its claims.  See Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) (describing standard for probability of success on the merits in preliminary injunction context); see e.g., Mishcon, 2011 WL 6957595 at *4 (applying the same standard for probability of success on the merits in context of attachment under New York law).  Often that requires more factual substantiation than would be sufficient for a pleading.  See Zenith Bathing Pavilion v. Fair Oaks S.S. Corp., 240 N.Y. 307 (1925).

1.      Breach of Contract Claims.

Discover alleges that 6D breached six clauses of the SPA: Clause II.C.6 in the "Closing Conditions" section and Clauses III.B.3, III.B.4, III.B.5, III.B.8 and III.B.17 in the "Representations Regarding Company" section.[6]  The elements of a claim for breach of contract

---

[6] Discover's complaint includes allegations that 6D also breached Clauses III.B.14 and III.B.20, but Discover has presented no argument on these clauses.

are: "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 921 N.Y.S.2d 260, 264 (2d Dep't 2011).[7]  The existence of a contract and Discover's performance under that contract are not in dispute.  6D denies, however, that it breached any of the terms of the SPA.

According to Discover, 6D breached the SPA by misrepresenting and omitting material information relating to Benjamin Wei.  Discover alleges that 6D failed to disclose the fact that a grand jury and the SEC were investigating Wei and that Wei dominated, controlled and engaged in financial manipulation of 6D.  Moreover, Discover argues that 6D affirmatively represented and warranted in the SPA that none of those facts existed.  To establish that 6D breached Clause III.B.17 and the last part of Clause III.B.5, Discover must show that 6D knew about Wei's pending grand jury and SEC investigations at the closing of the SPA.  To establish that 6D breached Clauses III.B.3 and III.B.8, Discover must show that Wei was actually dominating, controlling and engaging in financial manipulation of 6D at, or prior to, the time of closing, but it need not show that 6D knew of Wei's activities.  And, to establish a breach of Clause II.C.6, the first part of Clause III.B.5, and Clause III.B.4, Discover must show that one of the grand jury or SEC investigations was pending at the closing of the SPA and that the investigation "affected" 6D in a manner covered by those particular terms.  Discover fails to establish the likelihood that 6D breached any of these clauses.

---

[7] Although the SPA contains a governing law clause that provides for all matters between the parties to be governed by the laws of the Cayman Islands, (Compl. Ex. A, VI.G), neither party has argued that adjudicating this action under Cayman law would differ in any material way from doing so under New York law. (Tr., Oct. 5, 2015, p.35-36).  Under those circumstances, a court may apply the principle that implied consent to use a forum's law is sufficient to establish choice of law.  3Com Corp v. Banco do Brasil, S.A., 171 F.3d 739 (2d Cir. 1999).

When interpreting a contract, "a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). In cases where the parties dispute the meaning of particular clauses, "the task of the court 'is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (quoting Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)). When deciding whether a contract term is ambiguous, "a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990) (quoting William C. Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524 (1927) (alteration in original). It may also presume that the same words found in different sections of a contract have the same meaning, "unless the context indicates a different intention." White v. Knickerbocker Ice Co., 254 N.Y. 152, 159 (1930), abrogated on other grounds by, Knapp v. Hughes, 19 N.Y.3d 672 (2012); see also Eastman Kodak Co. v. Altek Corp., 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013), and apply the rule against surplusage, i.e., "a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." Corhill Corp. v. S. D. Plants, Inc., 9 N.Y.2d 595, 599 (1961) (quoting Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1956)) (internal quotations marks omitted); see also Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous."). If contract language is nevertheless susceptible to different interpretations then it is ambiguous, and the Court may

examine extrinsic evidence of the parties' intent when determining its meaning.  See <u>JA Apparel Corp. v. Abboud</u>, 568 F.3d 390, 397 (2d Cir. 2009).[8]

A.      6D's Knowledge of Wei's Grand Jury and SEC Investigations – Clauses III.B.17 and III.B.5.

With respect to Clause III.B.17 and the last part of Clause III.B.5, Discover has not established that it is probable that 6D knew that the grand jury and SEC investigations against Wei were pending on the date of closing.  From a plain reading of the warranties made in Clause III.B.17 and the last section of Clause III.B.5, Discover must establish 6D's knowledge of those investigations in order to succeed on its breach of contact claim based on those clauses.  Clause III.B.17, in relevant part, states: "Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements [of Trading Markets on which the Common Stock is listed]."  (Compl. Ex. A, III.B.17).  For 6D to have reason to believe that it will fall out of compliance with the listing requirements of NASDAQ—the trading market on which 6D shares were listed, (see <u>e.g.</u>, Szynkowski Decl. Ex. 3)—it must have knowledge of a particular circumstance that would reasonably cause a failure to comply.  Here, Discover alleges that the particular circumstance is the two pending investigations into Wei.  Thus, if 6D did not know of those investigations at the time of the closing, it could not have breached the warranty in Clause III.B.17.

---

[8] Another normal rule of contractual construction is the rule of *contra proferentem*: "that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 443 (2d Cir. 1995) (quoting <u>O'Neil v. Retirement Plan For Salaried Employees of RKO General, Inc.</u>, 37 F.3d 55, 61 (2d Cir. 1994).  The SPA, however, includes a "Construction" clause that states that the rule of *contra proferentem* will not be employed in the interpretation of the "Transaction Documents."  (Compl. Ex. A, VI.N).  "Transaction Documents" includes the SPA. (Compl. Ex. A, p.24).

Similarly, Clause III.B.5, in relevant part, states: "[t]here has not been, and to the knowledge of Company, there is not pending or contemplated, any investigation by the Commission involving Company or any current or former director or officer of Company." (Compl. Ex. A, III.B.5).   While the mere existence of a completed ("[t]here has not been") SEC investigation involving 6D would trigger a breach of that warranty, the existence of an SEC investigation pending at the time of closing would not trigger a breach unless 6D knew about it when it closed on the SPA.  Discover presented no evidence of an SEC investigation involving 6D that had ceased to be pending as of the closing; it only presented evidence of an SEC investigation that was pending at closing.  See SEC, Division of Enforcement, Enforcement Manual (June 4, 2015), *available at* http://www.sec.gov/divisions/enforce/enforcementmanual.pdf ("An investigation that has resulted in an enforcement action cannot be closed until all enforcement actions in the case are complete. This requires (1) a final judgment or Commission order and (2) all ordered monetary relief is accounted for. . .").  Because a pending SEC investigation is the basis for 6D's alleged breach of Clause III.B.5, 6D must have known of it at the closing of the SPA for a breach to be established.

Discover argues that 6D knew about the pending investigations because Wei was a close business partner (and, allegedly, *de facto* controlling shareholder) of 6D: "Mr. Wei has admitted to being in a close relationship with 6D Global, and so one would have to presume that they were aware of the fact that he had been raided."  (Tr., Oct. 5, 2015, p.14).  In making that argument, Discover relies only on circumstantial evidence of Wei's control over 6D; it provides no direct evidence that 6D actually knew of the pending investigations.  In fact, Discover relies predominately on the allegations made in the grand jury indictment and the SEC complaint.  (See

Compl. Ex. B, C).  The other limited circumstantial evidence supporting Discover's argument includes, for example, disputed accounts of August 18, 2015 statements by Wei and Tejune Kang, 6D's CEO, about Wei's control over 6D, (compare Kirkland Decl. ¶2 with Kang Decl. ¶17), and a private loan from Wei's wife to Kang that financed Kang's post-SPA purchase of 6D stock (Kang Decl. ¶20).  Meanwhile, Kang and Mark Szynkowski, 6D's CFO, both explicitly denied knowing about Wei's indictment or enforcement action prior to September 2015.  (Kang Decl. ¶21; Szynkowski Decl. ¶32).  The evidence, circumstantial and direct, does not support an inference that 6D had knowledge of Wei's grand jury and SEC investigations.  Wei may have had 45% ownership or even a majority ownership in 6D.  But, Wei was neither an officer, director nor employee of 6D.  It does not logically follow that because Wei had a substantial share ownership in 6D, he would disclose to the officers, directors, or employees of 6D, a public company, the existence of these secret government investigations and thereby risk that his internal disclosure would trigger a public disclosure obligation on the part of 6D.

Midway through the October 5 hearing, Discover asserted a new argument: Wei's own knowledge of the pending investigations should be imputed to 6D.  The two theories allegedly supporting a finding of imputed knowledge are that Wei was an agent of 6D and that Wei was the alter-ego of 6D.  (Tr., Oct. 5, 2015, p.23-24).  Both of those arguments fail as well. First, Wei may qualify as an agent of 6D in so far as 6D has admitted that Wei occasionally acted as an unpaid consultant who helped 6D connect with potential investors, such as Discover. (Kang Decl. ¶12).  But, even assuming *arguendo* that Wei was an agent in that capacity, Discover presented no evidence showing that Wei's knowledge—that he was the subject of two investigations for prior fraudulent business activities—was obtained while acting within the scope of that agency.  See  Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784 (1985) ("The

general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it."); In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) ("Acts performed and knowledge acquired by a corporate agent within the scope of his or her employment are imputed to the corporation.").  Furthermore, to the extent that Discover is alleging that Wei was acting as an agent of 6D and simultaneously defrauding 6D by withholding information about his previous, allegedly illegal business activities, the "adverse interest" exception may also apply and the "presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose."  Hampton Affiliates, 66 N.Y.2d at 784; see also In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997).

        Second, Discover has not demonstrated a likelihood of success in proving that Wei was the alter-ego of 6D.  See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138 (2d Cir. 1991) ("The critical question is whether the corporation is a "shell" being used by the individual shareowners to advance their own purely personal rather than corporate ends.") (internal quotations marks omitted).  The best that Discover was able to muster suggesting that Wei dominated 6D is circumstantial evidence in the form of disputed accounts of an August 18, 2015 meeting between the parties, (compare Kirkland Decl. ¶2 with Kang Decl. ¶17), one email from Kang characterizing Wei as a representative of NYGG-Asia, (Kirkland Decl. 2, Ex. A), a private loan from Wei's wife to Kang, (Kang Decl. ¶20), and allegations from the grand jury indictment and SEC complaint that Wei dominated CleanTech and was otherwise a corrupt businessman, (Compl. Ex. B, C).  The charge in the indictment and the allegation in the SEC complaint are not evidence of the truth of the assertions therein.  See

Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins. Co., 243 F.2d 949, 953 (2d Cir. 1957) ("The indictment, since it was only hearsay, was clearly inadmissible for any purpose."); Stevenson v. Hearst Consol Publications, 214 F.2d 902, 907 (2d Cir. 1954) (holding complaint from separate suit inadmissible as hearsay to prove the truth of matter asserted).  The most this shows is that Wei was involved in some way with 6D and NYGG-Asia.  Wei may have committed fraud in connection with the purchase and sale of the securities of 6D, but that circumstance does not establish that Wei dominated, controlled or used 6D, itself, for his personal ends.  Discover has not shown that 6D likely had actual or constructive knowledge of Wei's pending grand jury and SEC investigations at the time of closing and thus has not demonstrated a probability of success on its breach of contract claims based on Clause III.B.17 and the last part of Clause III.B.5.

B.      Wei's Domination, Control, and Financial Manipulation of 6D -- Clauses III.B.3 and III.B.8.

        With respect to Clauses III.B.3 and III.B.8, Discover has not shown a probability of success in proving that Wei was actually dominating, controlling and engaging in financial manipulation of 6D.  Clause III.B.3 includes a warranty that none of the public reports filed by 6D pursuant to the Securities Act, Exchange Act, and rules promulgated by the SEC contain "any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein . . . not misleading." (Compl. Ex. A, III.B.3).  Clause III.B.8 warrants that 6D is and has not been "in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business. . . ."  (Compl. Ex. A, III.B.8).  Discover alleges that 6D breached these provisions because its most recent 10-K and proxy failed to identify Wei or disclose his total domination and control of 6D and its SEC filings did not disclose that Wei was

siphoning off funds from 6D.  Discover has not demonstrated a probability of success in proving that 6D's public reports and filings were false in the way Discover alleges.

As described above, Discover has not shown a likelihood of success in proving that Wei actually controlled and dominated 6D.  And, Discover has failed to show that Wei siphoned off funds from 6D.  Discover's evidence, the strongest of which is the fact that Wei's wife provided a loan to Kang, does not make it significantly more likely that Wei was siphoning funds from 6D.  6D's CFO denies ever authorizing any payment to Wei and claims to have no knowledge that any money has ever been paid to Wei.  (Szynkowski Decl. ¶30).  Discover has not established a likelihood of success in proving that Wei was in fact dominating, controlling, and siphoning funds from 6D, nor that 6D's public reports and filings were materially false and misleading.  Discover, therefore, has not demonstrated a probability of success on a breach of contract claim predicated on Clauses III.B.3 or III.B.8.

C.      Clauses II.C.6, III.B.5 and III.B.4.

With respect to Clause II.C.6, the first part of Clause III.B.5, and Clause III.B.4, Discover has not shown a probability of success in proving that the grand jury or SEC investigation pending at the closing of the SPA impacted 6D in a manner covered by those particular terms of the SPA.  Discover fails to meet its burden on each of these clauses for reasons specific to the construction of each clause.  As such, the Court will address each of the clauses separately to explain why Discover has failed to meets its burden.

Clause II.C.6 of the SPA provides that the closing of the transaction is subject to satisfaction of the following condition:

> There is not then in effect any law, rule, or regulation prohibiting or restricting the transactions contemplated in any Transaction Document . . . nor is there any pending or, to the Company's knowledge threatened, proceeding or investigation which may

> have the effect of prohibiting or adversely affecting any of the
> transactions contemplated by this Agreement. . . ."

(Compl. Ex. A, II.C.6).  A plain reading of Clause II.C.6 establishes that a precondition to

closing is that there is no "pending . . . proceeding or investigations which may have the effect of

prohibiting or adversely affecting any of the transactions contemplated by" the SPA.  The clause

speaks in absolute terms ("[t]here is not then in effect . . .") and does not require 6D to have

knowledge of a "pending" investigation, unlike, for example, the part of Clause III.B.5 already

discussed.  Therefore, the mere fact that an investigation was pending at the time of closing

could trigger a violation of Clause II.C.6, if that investigation "may have the effect of prohibiting

or adversely affecting any of the transactions contemplated by this Agreement."

The parties disagree over the meaning of the phrase "transactions contemplated

by this Agreement."[9]  The Court finds that the language is not ambiguous and is reasonably

susceptible to only one interpretation.  "Transactions contemplated by this Agreement"

encompasses only the execution of the SPA: the parties' exchange of $10 million for 1,088

preferred shares of 6D.  Its meaning does not include the continued trading of 6D common stock

on NASDAQ.

"Transactions contemplated by this Agreement" first appears in the SPA in the

opening section of Clause II.C, "Closing Conditions," which states: "[t]he consummation of the

transactions contemplated by this Agreement ("Closing") is subject to the satisfaction of each of

the following conditions."  (Compl. Ex. A, II.C).  Taking account of the context and plain

meaning of the language, Clause II.C can only be understood as meaning that the "transactions

contemplated by this Agreement" will be finalized at the moment the parties satisfy the listed

---

[9] The Court requested, received, and reviewed supplemental briefing from the parties on this question.

closing conditions.[10]  If the "transactions contemplated by this Agreement" are complete at the closing of the SPA, they must refer to a specific and finite exchange and not continuing and/or future dealings.  The meaning of the critical phrase then becomes clear: the "transactions contemplated by this Agreement" can only mean the parties' exchange of $10 million for 1,088 preferred shares of 6D.[11]  It would be nonsensical for "transactions contemplated by this Agreement" to mean any future transactions, such as the continued trading of 6D common stock on NASDAQ, because that would expressly contradict the language of Clause II.C: by the words of the clause the "transactions contemplated by this Agreement" do not outlive the closing. Although the phrase as used in Clause II.C.6 could be read more broadly, the fact that Clause II.C.6 follows Clause II.C and that a broader meaning of the phrase would not fit the language of Clause II.C leads the Court to read the phrase "transactions contemplated by this Agreement" as having a consistent, narrow meaning throughout the SPA.  See Eastman, 936 F. Supp.2d at 351 (describing the interpretive rule that a court may "presume that the same words used in different parts of a writing have the same meaning").

Discover has put forth no evidence demonstrating that Wei's pending investigation had "the effect of prohibiting or adversely affecting" the execution of the SPA. Discover argues instead that the grand jury and SEC investigations of Wei frustrated Discover's future expectation of converting its preferred shares into common stock and then selling that common stock on NASDAQ.  But read in context, the continued trading of 6D shares on NASDAQ is not a "transaction[] contemplated by this Agreement."  As a result, Discover has

---

[10] First, the clause explicitly refers to the SPA's "closing conditions."  And, second, the definition of "consummation" is "the act of completing."  Webster's Third New International Dictionary (2002).
[11] The use of "transaction contemplated herein" in Clause II.C.1 and that Clause's explicit reference to the closing paperwork required by Clause II.B (various Certificates of Designation related to the purchase of stock) reinforces the narrow meaning of "transactions contemplated by this Agreement."

not demonstrated a likelihood of success on the merits of its claim that 6D breached Clause II.C.6.

The first part of Clause III.B.5 warrants that "[t]here is no Action pending or, to the knowledge of the Company, threatened, which would reasonably be expected to result in a Material Adverse Effect."  (Compl. Ex. A, III.B.5).  Proof that 6D knew than an "Action" was pending ("[t]here is no Action pending") is not required for there to be a breach.  The critical inquiry is whether the grand jury and SEC investigations of Wei qualify as "Actions."  The Court finds that they are not "Actions."

An "Action" is defined in Clause III.A.4 as any:

> action, suit, inquiry, notice of violation, proceeding or investigation pending . . . against or affecting Company, any subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") . . . .

(Compl. Ex. A, III.A.4).  It is not disputed that the grand jury and SEC investigations are "pending . . . investigations . . . before or by any court . . . governmental or administrative agency."  They are not, however, investigations "against or affecting" 6D.  To understand what investigations are captured by the terms "against" and "affecting," the Court looks to the plain meaning of the words giving due consideration to the surrounding terms of the SPA.

First, the definition of "Action" requires that no pending investigation is "against" 6D.  Used in this context, "against" means "in opposition or hostility too."  Webster's Third New International Dictionary (2002).  A fair understanding of the term "against," in the context of a "suit, inquiry . . . investigation" pending "against" 6D, is that 6D would have to be a target of the investigation.  Utilizing the rule against surplusage, "against" must mean something different than "affecting" because Clause III.A.4 uses "affecting" as a term separate from "against."  <u>See</u>

Int'l Multifoods Corp., 309 F.3d at 86.  In comparison to "affecting," "against" connotes an investigation that targets 6D.

The pending grand jury and SEC investigations, however, did not name or target 6D.  (See Compl. Ex. B, C).  The SEC enforcement action does assert claims against NYGG, and appears to allege that NYGG-Asia is the Beijing office of NYGG.  (Compl. Ex. C).  6D's most recent 10-K states that NYGG-Asia, not NYGG, is the 45% shareholder of 6D.  (Szynkowski Decl., Ex. 5, p.23).  Although Discover disputes that NYGG and NYGG-Asia are separate entities, Discover has not come forward at this stage with persuasive evidence to prove that the two companies are one and the same.  Because 6D was not the target of the investigations, they are not "against" 6D.

Second, the investigations also do not "affect" 6D.  Webster's defines "affect" as "to act upon."  Webster's Third New International Dictionary (2002).  With respect to an investigation "affecting" 6D, the term reasonably implies those investigations or suits that anticipate directly impacting 6D or would likely lead to some relief to the detriment of 6D.  For example, an investigation that, although not formally targeting 6D, ultimately resulted in 6D paying a fine, forfeiting property, or disgorging profits would be an investigation "affecting" 6D. "Affecting" is broader than "against," but still refers only to those investigations that act directly upon 6D.

A comparison with the language of the last part of Clause III.B.5 reinforces this narrow reading of "affecting."  While Clause III.A.4 deals with SEC investigations "*against or affecting* Company," the last sentence of Clause III.B.5 warrants that there has not been "any investigation by the Commission *involving* Company."  (Compl. Ex. A, III.B.5) (alterations added).   Observing the rule against surplusage, there must be some meaningful difference

between the litigation representations made in Clause III.A.4 and the first part of Clause III.B.5

("affecting" 6D) and the litigation representation made in the last part of Clause III.B.5

("involving" 6D).  If not, the representation in the last part of Clause III.B.5, that there are no

investigations "by the Commission *involving* Company," would serve no purpose.

   A fair understanding of "affecting" is that it is a narrower term than "involving."

Whereas "affect" means to "act upon," Webster's defines "involve" as "to draw in as a

participant . . . to oblige to become associated."  Webster's Third New International Dictionary

(2002).  "Involving" thus more appropriately includes investigations that create collateral or

indirect consequences on 6D, while investigations "affecting" 6D must directly impose

consequences on the company.  The fact that the parties choose to use both words in different

parts of the SPA reinforces the understanding that "affecting" should be read differently, and

more narrowly, than "involving."  For example, Clause III.A.4 is more tailored than the last part

of Clause III.B.5.  Clause III.A.4 specifically warrants that there is no investigation "against or

affecting Company . . . which would reasonably be expected to adversely affect or challenge the

legality . . . of any of the Transaction Documents or the issuance of any Shares hereunder."

(Compl. Ex. A, III.A.4).  Meanwhile, Clause III.B.5 broadly represents that there has not been

any SEC investigation "involving Company."  A narrow reading of "affecting" as compared to

"involving" is in accord with the evident scope of each clause.

   As measured by the indictment and SEC complaint, it is likely that the grand jury

and SEC investigations "involv[ed]" 6D to the extent that the claims relate, in part, to actions

Wei took in relation to the purchase and sale of the securities of CleanTech, a predecessor

company to 6D.  But, the evidence does not show that the investigations were "affecting" 6D.

6D has not had to answer to the government for any of Wei's actions, nor has the government

subsequently targeted 6D.  In fact, the only measurable effect the investigations have had on 6D is that NASDAQ has suspended trading of its common stock.  The action of a private entity like NASDAQ is, however, collateral to the grand jury and SEC investigations and is not a basis on which to claim that the investigations were "affecting" 6D.

Discover has not demonstrated a likelihood of proving that the grand jury or SEC investigation of Wei qualify as an investigation "against or affecting" 6D.  Thus, it is not demonstrated that either is an "Action" within the meaning of Clause III.A.4.  The existence of those pending investigations does not, therefore, trigger a breach of the first part of Clause III.B.5.

Finally, Clause III.B.4 states:

> Since the end of the most recent year for which an Annual Report on Form 10-K has been filed with the Commission, (a) there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect. . .

(Compl. Ex. A, III.B.4).  Discover alleges that 6D breached this clause because the investigations into Wei—which led to NASDAQ suspending trading in 6D common stock and were pending at the closing of the SPA—constitute an occurrence or development "that would reasonably be expected to result, in a Material Adverse Effect."  The Court finds that the grand jury and SEC investigations into Wei do not qualify as an "occurrence or development" within the meaning of Clause III.B.4.

Although the language in that first section of Clause III.B.4 appears to be broader than any other language in the SPA, the Court reads it as addressing only those events directly impacting 6D's financial practices and performance, developments which 6D would be legally obliged to include in its subsequent 10-K.  This reading of Clause III.B.4 is appropriate given the

content of the rest of the Clause as well as the subject matter of other clauses in the SPA,

specifically the first part of Clause III.B.5, which the Court has previously addressed.  The first

Section of Clause III.B.4 specifically references those events that have occurred since the filing

of the 6D's most recent 10-K, its annual financial report.  The rest of the Clause lists

representations that deal specifically with 6D financial practices and particularities.  Section (b)

discusses financial liabilities; section (c) discusses methods of accounting; section (d) discusses

dividends; and, section (e) discusses issuance of equity securities.  None of them deal with

litigation.

Clause III.B.5, meanwhile, specifically warrants that "[t]here is no Action

pending or, to the knowledge of the Company, threatened, which would reasonably be expected

to result in a Material Adverse Effect."  (Compl. Ex. A, III.B.5).  If Clause III.B.4 was broad

enough to cover pending SEC investigations, then Clause III.B.5 would be rendered inoperative.

Clause III.B.4 is not the SPA's catch-all clause.  If Clause III.B.5, the clause that makes specific

representations regarding "Litigation," does not capture the pending investigations, than the

Court will not read Clause III.B.4, the clause about "Material Changes" to 6D's financial

practices and performance, as a general clause capable of picking up the slack.  See Sompo Japan

Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 179 (2d Cir. 2014) (describing the rule of

construction that a specific contract provision should prevail over a general one).  Because Wei's

grand jury and SEC investigations are not of the subject matter targeted by Clause III.B.4, there

is no basis to conclude that Discover has established the likelihood that 6D breached Clause

III.B.4.

In sum, Discover has failed to establish the likelihood that 6D breached any of the

clauses of the SPA.

2.      Securities and Fraud Based Claims.

        Discover also alleges that 6D violated sections 10(b) and 29(b) of the Exchange

Act and committed fraud, fraudulent inducement, and conspiracy to commit fraud.  For all those

claims except its section 10(b) claim, Discover provided no explanation of how the evidence

presented supports a finding of a probability of success on the merits.  Discover stated in its

memorandum of law only that "on the face of the facts before this Court, it is probable that

plaintiff will succeed on the merits."  (Plaintiff's Memorandum of Law, p. 20).  Nevertheless, all

of these claims are dependent on Discover demonstrating that, at the closing of the SPA, 6D had

knowledge of the pending grand jury and SEC investigations into Wei or of Wei's domination,

control, and financial manipulation of 6D.  Discover had failed to prove a probability of success

on the merits of any of these claims because it cannot show 6D had the requisite knowledge.

        To succeed on its section 10(b) claim, Discover must show that 6D: "(1) made

misstatements or omissions of material fact; (2) with scienter; (3) in connection with the

purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was

the proximate cause of their injury."  In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir.

1998).  Scienter is a "mental state embracing intent to deceive, manipulate, or defraud."  Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 193-94 and n.12 (1976)).  At the pleading stage, a plaintiff can satisfy

the element of scienter by making "a strong showing of [defendant's] reckless disregard for the

truth," S. Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009), or by

demonstrating that the defendant "knew facts or had access to information suggesting that their

public statements were not accurate," Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

Discover asserts that the Court can infer scienter here because 6D made representations in the

SPA that it knew were false and omitted critical information from the SPA that it knew was material.

If Discover fails to show a probability of success on the section 10(b) claim, Discover necessarily fails to show a probability of success on its section 29(b) claim because "rescission of a contract pursuant to Section 29(b) is not available without an underlying violation of the substantive provisions of the securities laws." Pompano-Windy City Partners, Ltd. V. Bear Stearns & Co., 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (citing Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur, 892 F.2d 199, 206 (2d Cir. 1989)); see also Boguslavsky v. Kaplan, 159 F.3d 715, 722 (2d Cir. 1998) ("Section 29(b) provides for the rescission of a contract if the contract violates any provision of the Act or its regulations.").

Discover's fraud, fraudulent inducement, and conspiracy to commit fraud claims also require a showing that 6D had knowledge of the alleged false representations and material omissions in the SPA. See Terra Sec. Asa Konkursbo v. Citigroup, Inc., 740 F. Supp. 2d 441, 447-48 (S.D.N.Y. 2010) (describing the elements of a common law fraud claim under New York law); Robinson v. Deutsche Bank Trust Co. Americas, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (describing the elements of a fraudulent inducement claim under New York law); 380544 Canada, Inc. v. Aspen Tech., Inc., 633 F. Supp. 2d 15, 36 (S.D.N.Y. 2009) (describing the elements of a conspiracy to commit fraud claim).

As described above, Discover has failed to show a likelihood of proving that, at the closing of the SPA, 6D had knowledge of the grand jury or SEC investigation into Wei.  Nor has Discover shown a likelihood of proving that Wei dominated, controlled, and manipulated 6D.  Because Discover cannot establish that 6D had knowledge, its claim that the Court can infer scienter from 6D's knowledge also fails.  As a result, the Court finds that Discover has not met

its burden of demonstrating a likelihood of success on the merits of its section 10(b), section 29(b), fraud, fraudulent inducement, or conspiracy to commit fraud claims.

3.      The Remainder of Discover's Claims.

Discover's last six claims are for indemnity under the SPA, common law recession, constructive trust, negligent misrepresentation and negligence.  Again, Discover articulated no theory as to how any of the evidence supports any of these six remaining claims.  As it did with respect to its fraud claims, Discover merely asserted in its memorandum of law that "on the face of the facts before this Court, it is probable that plaintiff will succeed on the merits."  (Plaintiff's Memorandum of Law, p. 20).  That is not sufficient to carry the burden at the provisional remedy stage.  Because Discover did not argue any specific evidentiary basis for these remaining claims, Discover fails to establish a likelihood of success on the merits of each.

Discover has failed to show a probability of success on the merits of any of the eleven claims is alleges against 6D, it thus has not satisfied the statutory requirements for an attachment in aid of arbitration pursuant to section 7502(c) of the New York CPLR.  Even if any arbitration award may be "rendered ineffectual" without an attachment and even though there are no counterclaims against Discover, the Court may not properly order an attachment in aid of arbitration in the absence of Discover establishing a probability of success on the merits of at least one of its twelve claims.

CONCLUSION

For the foregoing reasons, Discover's motion for an order of attachment in the amount of $10 million is DENIED.  The temporary restraining order is VACATED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       October 30, 2015